707 A.2d 891

**Brian REGAN**

v.

**BOARD OF CHIROPRACTIC EXAMINERS.**

**No. 474, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 1, 1998.

496

Melvin J. Sykes (Carol L. Rubin, Eric M. Newman and Fisher & Winner, L.L.C., on the brief), Baltimore, for appellant.

Cynthia G. Peltzman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Roberta L. Gill, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SALMON and EYLER, JJ.

EYLER, Judge.

Appellant, Brian Regan, D.C. (Dr. Regan) was charged with violations of the Maryland Chiropractic Act, Md.Code Ann., Health Occ. (HO), §§ 3–101 to 3–602 (1994), by appellee, the Board of Chiropractic Examiners (the Board). After an evidentiary hearing, the Board found violations and imposed sanctions. On judicial review, the Circuit Court for Baltimore City affirmed. Dr. Regan contends that (1) he was denied due process and (2) the Board acted beyond the scope of its powers. We find no error and affirm the judgment of the circuit court, except as to the sanctions imposed. With respect to sanctions, we vacate that portion of the judgment and remand for further proceedings.

## Facts

During the relevant time period, from 1989 until 1992, Dr. Regan was a licensed chiropractor and an owner of the Yalich Clinic located in Bel Air, Maryland. On July 7, 1994, the

Board charged Dr. Regan with the following violations of the Maryland Chiropractic Act:

(1) soliciting or advertising in a false and misleading manner or in any other manner not approved by the Board (HO § 3–313(7));

(2) unethical conduct in the practice of chiropractic (HO § 3–313(8));

(3) wilfully making or filing a false report or record in the practice of chiropractic (HO § 3–313(12));

(4) practicing chiropractic with an unauthorized person or supervising or aiding an unauthorized person in the practice of chiropractic (HO § 3–313(18));

(5) violating any rule or regulation adopted by the Board (HO § 3–313(19));

(6) behaving immorally in the practice of chiropractic (HO § 3–313(20));

(7) committing an act of unprofessional conduct in the practice of chiropractic (HO § 3–313(21)); and

(8) improper advertising of a trade name (HO § 3–407 [1] and COMAR 10.43.03.05).

The acts with which Dr. Regan was charged were summarized in the charging document as follows:

---

1. HO § 3–407 (1994 & 1997 Supp.) provides:

    A licensed chiropractor may use a trade name in connection with the practice of chiropractic provided that:

    (1) The use of the trade name is not deceptive or misleading;

    (2) The advertisement in which the trade name appears includes the name of the licensed chiropractor or the name of the business entity providing the chiropractic services being advertised as long as the advertisement includes the name of a licensed chiropractor;

    (3) The name of the licensed chiropractor providing chiropractic services appears on the billing invoices, stationery, and on any receipt given to a patient;

    (4) Treatment records are maintained that clearly identify the licensed chiropractor who has performed the chiropractic service for the patient; and

    (5) The use of a trade name is preapproved by the Board before use.

The Respondent committed the following acts, all in violation of the Maryland Chiropractic Act: hiring, supervising, and aiding unlicensed persons in the practice of chiropractic; making and submitting false reports; soliciting employees for the sole purpose of obtaining information to use against the Board; advising examination doctors to perform unnecessary treatments; and advertising in a manner that is misleading.

Because of the nature of the issues before us, we set forth verbatim certain paragraphs contained in the "allegations of fact." The remaining paragraphs, D–H and M, allege that Dr. Regan permitted certain named and unlicensed individuals to engage in the practice of chiropractic. The relevant paragraphs are:

A. At all times relevant to the charges herein, the Respondent was licensed to practice chiropractic, with the right to practice physical therapy.

B. At all times relevant hereto prior to June 4, 1991, the Respondent and Dr. Lawrence Yalich owned and operated the Yalich Clinic located in Bel Air, Maryland (the "Bel Air Clinic"). Subsequent to June 4, 1991, the Respondent was the sole owner of the chiropractic portion of the Bel Air Clinic.

C. Between the period of 1989 and 1992, the Respondent hired and employed several individuals to perform chiropractic duties.

. . . .

I. In June 1992, Aileen Regan, the Respondent's sister, a chiropractic school graduate not licensed in the State of Maryland, was hired by the Respondent to work in the Bel Air Clinic. The following facts are pertinent to Aileen Regan's association with the Respondent at the Bel Air Clinic:

(1) Aileen Regan worked in the Respondent's clinic as an examination doctor until her departure in September 1992.

(2) The Respondent knew or should have known that Aileen Regan was not licensed to practice chiropractic in the State of Maryland.

(3) In the Spring of 1993 the Board commenced an investigation into the Respondent's practice of chiropractic. While under investigation, the Respondent requested that Aileen Regan go to the office of Board member, Dr. Howard Lewis, who practiced near the Respondent's Bel Air office.

(4) The Respondent asked Aileen Regan to entice Dr. Lewis into having a sexual liaison with her so that Respondent could have something to use against the Board. Ms. Regan declined the Respondent's request.

J. From April 1992 through March 10, 1994, Joan Gee was a regional manager for the Yalich Clinics. In this capacity, she oversaw the administrative duties at various Yalich Clinics. The following facts are pertinent to Joan Gee's association with the Respondent at the Bel Air Clinic:

(1) The Respondent asked Joan Gee to approach Dr. Lewis in his office and try to entice him into having a sexual liaison with her. The Respondent told Ms. Gee that she would lose her job if she did not meet with Dr. Lewis at his office.

(2) Ms. Gee made an appointment at Dr. Lewis' clinic. Ms. Gee went to Dr. Lewis' clinic, but she did not try to sexually entice him.

(3) The Respondent also asked Ms. Gee to sexually entice Dr. D. Brent Owens, a Board member, and Dr. Joseph Hughes, the President of the Maryland Chiropractic Association. Ms. Gee made appointments with each doctor at their respective offices, but she decided not to keep her appointments.

K. In January 1989, the Respondent hired Deborah Tibbs as a chiropractic assistant. The following facts are pertinent to Deborah Tibbs' association with the Respondent at the Bel Air Clinic:

(1) Ms. Tibbs performed the duties of a chiropractic assistant until the fall of 1991, when she began to perform

patient examinations, consultations, and reports for worker's compensation and personal injury patients.

(2) Ms. Tibbs is not a graduate of chiropractic school and is not licensed to practice chiropractic in the State of Maryland.

(3) Ms. Tibbs conducted approximately fifty consultations and approximately thirty-five to forty patient examinations per week until she quit in the Fall of 1992. After examining a patient, Ms. Tibbs discussed with the Respondent the results of her examination. Ms. Tibbs provided the Respondent with the medical history and information that she gathered from the consultation with the patients.

(4) The Respondent knew or should have known that Ms. Tibbs was not licensed to practice chiropractic in the State of Maryland.

(5) Ms. Tibbs' duties also required that she complete various patient reports following a patient examination. She made patient assessments without input from the Respondent. In workers compensation and personal injury cases, the Respondent told Ms. Tibbs to indicate on the reports that the patient was not progressing satisfactorily so that patient treatment could be prolonged. The reports were then submitted to various insurance companies.

(6) Ms. Tibbs was often present when a patient received therapy and knew what therapies had been given to the patient. Ms. Tibbs observed the Respondent review patient fee sheets of insured and [sic] patients and indicate that certain therapies had been provided to the patient, when such therapies had not been received by the patient. If a patient had insurance, the Respondent often billed the insurance company for adjustments, ultrasound, electrical stimulation, and hot/cold therapy, even if the patient had not received each billed treatment. The Respondent forwarded the erroneous information to the insurance company for payment.

L. In November 1990, Michelle McCarty, who is not licensed in Maryland as a chiropractor, began working as a

rehabilitation therapist for the Respondent and Dr. Yalich in the Bel Air clinic. She conducted testing and performed exercise instructions for which the professional skills and judgment of a licensed chiropractor are needed. The following facts are pertinent to Michelle McCarty'[s] association with the Respondent at the Bel Air Clinic:

(1) Ms. McCarty performed comprehensive muscle testing on the Dynatron 2000 machine. She also performed the surface electromyography test, the grip strength test, and the range of motion test.

(2) Ms. McCarty received no formal training or supervision from the Respondent on how to conduct the tests.

(3) The Respondent knew or should have known that Ms. McCarty was not licensed to practice chiropractic in the State of Maryland.

. . . .

N. In August 1991, the Respondent hired Laura Orem to work in the Bel Air Clinic as a front desk receptionist, chiropractic assistant, and examination assistant at the Bel Air Clinic. In January 1992, Ms. Orem became a patient of the Respondent. During the course of her treatment, the Respondent billed Ms. Orem's insurance for physical therapy she never received.

O. In the Fall of 1991, the Respondent hired Karen Trotta to work as a chiropractic assistant at the Bel Air Clinic. The following facts are pertinent to Ms. Trotta's association with the Respondent at the Bel Air Clinic:

(1) In the fall of 1992, Ms. Trotta took over the position vacated by Deborah Tibbs. Ms. Trotta's duties included patient consultations, performing patient examinations, and reports. Ms. Trotta conducted three to eight examinations per week.

(2) The Respondent trained Ms. Trotta for approximately two weeks. Ms. Trotta usually was unsupervised when she conducted consultation and examinations.

(3) The Respondent knew or should have known that Ms. Trotta was not licensed to practice chiropractic in the State of Maryland.

P.  The Respondent was involved in bi-monthly meetings with those unlicensed persons listed herein who performed examinations.  During these meeting these persons were told to keep patients in treatment even if patients were no longer in need of treatment.

Q.  The Respondent advertised in a manner that violated the Act and COMAR 10.43.03.  Specifically, on December 15, 1993, an advertisement for a "Free Pain Evaluation" to be given at the Bel Air Clinic, appeared in *The Aegis,* a Harford County newspaper.  The advertisement was submitted by the Respondent's Bel Air Clinic.  The advertisement failed to list the Respondent's name or the name of any licensed chiropractor associated with the Bel Air Clinic.

R.  In the Fall of 1993, an advertisement submitted by the Respondent, for "Free Pain Evaluation" to be given by the Bel Air Clinic appeared in *The Harford Impulse,* a publication distributed in Harford County.  The advertisement was submitted by the Bel Air Clinic.  Although the advertisement listed the name of several medical doctors and doctors of podiatric medicine, it failed to list the Respondent's name or the name of any licensed chiropractor associated with the Bel Air Clinic.

An evidentiary hearing was scheduled before a quorum of the Board that included: Audie G. Klingler, D.C., president and presiding panel member; Howard Lewis, D.C., vice-president; Florence G. Blanck, D.C., secretary-treasurer; Paul Goszkowski, D.C.; and Ivy Logan Harris, consumer member.[2]

On October 6, 1994, prior to the evidentiary hearing, Dr. Regan filed a pleading entitled "Motion for Recusal of Board

---

**2.**  David Carey, an attorney, was one of the two consumer members of the Board.  He recused himself from the proceedings because his law firm previously handled a criminal matter involving Dr. Regan's office manager, who was to testify as a witness in the proceedings.

Members and Delegation of Hearing to Office of Administrative Hearings." On the same date, Dr. Regan also requested that the Board issue subpoenas to Drs. Blanck, Klingler, and Lewis, to compel their appearance at the evidentiary hearing as witnesses.

In support of his motion for recusal, Dr. Regan made several arguments. First, he argued that Drs. Klingler and Lewis ought not to participate in the proceedings because: (1) Dr. Regan intended to call them as witnesses; (2) they were biased against Dr. Regan; (3) they were personally involved in matters as to which there were disputed evidentiary facts; and (4) at a minimum, their participation would create an appearance of impropriety.

Second, Dr. Regan argued that Dr. Blanck should also be recused because, as the most senior member of the Board after Dr. Lewis, he intended to call her as a witness regarding:

the Board's response to the mandate of the 1993 Maryland General Assembly that, on or before October 15, 1993, it report to the House Environmental Matters Committee and the Senate Economic and Environmental Matters Committee on "(1) The qualifications necessary for persons who are chiropractic assistants; and (2) what standards are appropriate for the practice of chiropractic in Maryland."

*See* 1993 Md. Laws 87(2). In addition, Dr. Regan intended to call Dr. Blanck to testify with respect to the Board's interpretation of its 1982 policy guidelines concerning the delegation of duties to chiropractic assistants.

Third, Dr. Regan contended that dismissal of the entire board was necessary to avoid an appearance of impropriety. He repeated the arguments as to Drs. Klingler, Lewis, and Blanck and also argued that Drs. Lewis and Goszkowski would benefit economically by an adverse decision to Dr. Regan because their chiropractic practices are within the same geographic area as Dr. Regan's.

Finally, Dr. Regan argued that his matter be delegated to the Office of Administrative Hearings (OAH) in order to avoid

an appearance of impropriety, and to avoid an appeal in the event of an unfavorable decision to him. In addition, Dr. Regan argued that delegation to the OAH was appropriate because if Drs. Klingler, Lewis, and Blanck were dismissed, the Board would be unable to convene a quorum.

During oral argument, appellant's counsel clarified that, on appeal, Dr. Regan challenges only the participation of Drs. Klingler and Lewis in the Board's proceedings. Specifically, he contends that Dr. Lewis should have recused himself because the charge that he, Dr. Regan, behaved immorally in violation of HO § 3–313(20) was, according to the charging document, based on an allegation that Dr. Regan engineered a scheme to sexually compromise two members of the Board, one of whom was Dr. Lewis. As to Dr. Klingler, appellant contends that recusal was necessary because Dr. Klingler had been personally involved in the events resulting in the filing of advertising charges in violation of HO §§ 3–313(7), 3–407, and COMAR 10.43.03.05. Dr. Regan had advertised the services of his Bel Air Clinic in a newspaper without including his own name. In a telephone conversation with Dr. Klingler, Dr. Regan was advised that the advertisements were required to bear his name.[3]

By order dated October 18, 1994, the Board denied Dr. Regan's motion for recusal and request for subpoenas. On November 2, 1994, Dr. Regan filed in the Circuit Court for Harford County a petition for judicial review of the denial of the motion and the request for subpoenas. The circuit court denied the request for relief.

By letter dated November 10, 1994, the Board dismissed the advertising charges in violation of HO §§ 3–313(19), 3–407, and COMAR 10.43.03.05 on the ground that some of the matters alleged had occurred before the effective date of HO § 3–407, and with respect to the remaining allegations, Dr. Regan had withdrawn the advertisements after his telephone conversations with Dr. Klingler.

---

**3.** *See* HO § 3–407, effective October 1, 1993.

The Board conducted an evidentiary hearing on November 14, 15, and 17, 1994, and on January 27, 29, February 7, and 9, 1995. At the beginning of the hearing, Dr. Regan renewed his motion for recusal, and it was denied by the Board. At the conclusion of evidence offered against Dr. Regan, the Board dismissed the charge of behaving immorally in violation of HO § 3–313(20). After all evidence had been received, on August 10, 1995, the Board issued its findings. The Board, finding that Dr. Regan had violated HO §§ 3–313(8), (12), (18), and (21), suspended his license for two years, ordered three years probation, and imposed a fine in the amount of $5,000.

The Board's opinion is 92 pages in length and is broken down into the following sections: Synopsis of Case, Synopsis of Witness Testimony, List of Exhibits, Findings of Fact, Conclusions of Law, and Order. In summary, the Board found that ten of Dr. Regan's employees had taken patient histories, consulted with patients, and had performed examinations using a form developed by Dr. Regan. The examinations included range of motion, orthopedics, neurological testing, abdominal palpations, and kidney tests. The Board also found that Dr. Regan's employees had taken x-rays, filled out patient assessment forms for insurance reimbursement, applied physical therapy modalities on patients, and conducted testing. The Board concluded that Dr. Regan had improperly delegated these functions to unlicensed individuals. The Board also found that Dr. Regan had instructed employees to falsify records in order to prolong treatments and that he had billed for treatments not actually performed.

On August 17, 1995, Dr. Regan filed a petition for judicial review in the Circuit Court for Baltimore City, along with an emergency motion for a stay pending appeal. On August 23, 1995, by consent order, the Honorable John N. Prevas stayed the Board's order, *nunc pro tunc*, pending the appeal. On February 6, 1997, the Honorable Paul A. Smith affirmed the Board's decision. This appeal followed.

### Questions Presented

1. Did the Board violate Dr. Regan's federal and state constitutional rights of due process when:

    A.   The Board denied Dr. Regan's Motion for Recusal, even though the Board's hearing panel included one member who was identified in the Charging Document as the target of an alleged "blackmail" scheme orchestrated by Dr. Regan and had personal knowledge of disputed evidentiary facts concerning that charge and another member who had personal knowledge of facts material to another charge; and,

    B.   During the hearing, without prior notice to Dr. Regan, the Board conducted aggressive inquisition of witnesses on matters ranging well beyond the Allegations of Fact in the Charging Document and prosecuted Dr. Regan and found him guilty on the basis of the new "Facts" developed at the hearing.

  2.  Did the Board commit reversible error of law when, having failed to obey a statutory command to adopt regulations concerning chiropractic assistants, it held in an adjudicatory proceeding that Dr. Regan's employees were engaged in the practice of chiropractic even though their duties did not come within the definition of the practice of chiropractic set forth in the Act because they did not diagnose, manipulate, treat, or use a system of health care based on the principle that interference with the transmission of nervous impulses may cause disease?

## STANDARD OF REVIEW

             Generally, judicial review of an administrative agency's action "is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Service, Inc. v. People's Counsel For Baltimore County*, 336 Md. 569, 577, 650 A.2d 226 (1994). In determining whether the agency's decision is supported by substantial evidence, a court must consider whether reasoning minds reasonably could have reached the agency's factual conclusion.

*Eberle v. Baltimore County,* 103 Md.App. 160, 166, 652 A.2d 1175 (1995). To the extent that issues on appeal turn on an agency's factual findings, a reviewing court may not substitute its judgment for that of the administrative agency. *United Parcel,* 336 Md. at 576–77, 650 A.2d 226. A court may not uphold an agency's order, however, " ' unless it is sustainable on the agency's findings and for the reasons stated by the agency.' " *United Parcel,* 336 Md. at 577, 650 A.2d 226 (quoting *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984)).

In the instant case, we are not called upon to review the factual findings of the Board. Instead, both issues on appeal require a legal analysis. Specifically, question one requires us to apply a due process analysis, and question two requires us to review the Board's decision in light of the substantive law of Maryland.

## Due Process

■ Both Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment to the United States Constitution guarantee that a person will not be deprived of life, liberty, or property without due process of law. The question of whether a party is deprived of the right to due process involves an issue of law and not of fact. As such, the standard of review applied by an appellate court is *de novo.* *Liberty Nursing Center v. Department of Health and Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993). Consequently, we may substitute our judgment for that of the agency.[4] *Maryland State Department of Education v. Shoop,* 119 Md. App. 181, 196, 704 A.2d 499 (1998)(citing *Department of Human Resources v. Thompson,* 103 Md.App. 175, 190, 652 A.2d 1183 (1995)).

■■ Although procedural due process arguments have rarely been addressed in the context of reviews within an

---

**4.** This standard of review is referred to as the "substituted judgment standard."

administrative agency, this Court has held that for an "appellant to establish a violation of procedural due process, he must first show that state action has resulted in his being deprived of a property interest." *Bragunier Masonry Contractors, Inc. v. Maryland Commissioner of Labor and Industry,* 111 Md. App. 698, 712, 684 A.2d 6 (1996)(quoting *Vavasori v. Commission on Human Relations,* 65 Md.App. 237, 243, 500 A.2d 307 (1985)). A party has a valid property interest in an administrative appeal. *Bragunier,* 111 Md.App. at 712, 684 A.2d 6; *see generally Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428–29, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982). In the instant case, Dr. Regan has a legitimate property interest in the outcome of the Board's proceedings regarding his license to practice chiropractic.

When the deprivation of a property interest is at stake, the deprivation must " 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.' " *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)(*quoting Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)). Moreover, procedural due process requires a fair trial in a fair tribunal. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Such principles apply to any tribunal, be it a judge, jury, or an administrative body. *Peters v. Kiff,* 407 U.S. 493, 501, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973).

In *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court identified the three factors to be considered when courts address procedural due process issues in administrative settings. Courts must consider:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The level of due process required must be decided based on the circumstances of each individual case. *Bragunier,* 111 Md.App. at 713, 684 A.2d 6; *Beeman v. Department of Health and Mental Hygiene,* 107 Md.App. 122, 142, 666 A.2d 1314 (1995).

### Substantive Law

■ A reviewing court will accord no deference to an agency's decision on matters of law. *Lee v. Maryland National Capital Park and Planning Commission,* 107 Md.App. 486, 492, 668 A.2d 980 (1995). Consequently, when an error of law is alleged, a reviewing court is at liberty to substitute its judgment for that of the agency. *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 651–52, 701 A.2d 879 (1997).

### DISCUSSION

### I.

### A.

■ On appeal, Dr. Regan argues that the law applicable to court proceedings and to OAH hearings is applicable to the proceeding before the Board. In Maryland, there is a presumption that a judge is impartial. *Boyd v. State,* 321 Md. 69, 80, 581 A.2d 1 (1990); *Doering v. Fader,* 316 Md. 351, 355–56, 558 A.2d 733 (1989). Thus, when an allegation of actual bias or prejudice is made, the burden is on the individual making the allegation to show bias or prejudice from the record. *Boyd,* 321 Md. at 80–81, 581 A.2d 1. In *Boyd,* the Court of Appeals held:

The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.

*Boyd,* 321 Md. at 75, 581 A.2d 1 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966)). In so holding, the Court noted that judges generally "enjoy a broad range of discretion in ruling on motions for recusal when there is no constitutional or statutory disqualification." *Boyd,* 321 Md. at 74, 581 A.2d 1. The Court went on to state, however, that "[m]ore recently, the rules of disqualification have been established by statute or by rule of court." *Id.* at 75, 581 A.2d 1.

In Maryland, rules of disqualification have been set forth in the Maryland Code of Judicial Conduct. Specifically, Canon 3 C of the Code provides, in pertinent part, that:

(1) A judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

Maryland Rule 16–813. In addition, Maryland Rule 5–605 provides that "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." These authorities are not expressly applicable to boards such as the one in this case.

With respect to the OAH, an administrative law judge (ALJ) must conduct a full, fair, and impartial hearing. CO-MAR 28.02.01.08(A)(1). An ALJ must withdraw from a proceeding when "personal bias or other reasons render the judge unable to provide an impartial hearing and decision, or when an appearance of impropriety may reasonably be inferred from the facts." COMAR 28.02.01.08(C)(1)(a). This provision is relevant by analogy to the case before us because the Administrative Procedure Act (APA)[5] applies to ALJs and the Board with relatively equal force.

---

**5.** The Administrative Procedure Act is found at Md.Code Ann., State Gov't (SG), §§ 10–201 et seq. (1995 and Supp.1997).

■ At the time Dr. Regan filed his motion, he sought the recusal of four of the six members of the Board or, in the alternative, the recusal of the entire board. It was only on appeal that Dr. Regan limited his recusal challenges to Drs. Lewis and Klingler. In order to hear a matter, a quorum of the Board must be present at the proceedings. According to the Board's bylaws, a quorum required that at least four Board members be present. Thus, had the Board granted Dr. Regan's motion it could not have formed a quorum and would have been forced to delegate the matter to the OAH, thereby depriving itself of jurisdiction, a result urged by Dr. Regan.

We note, however, that under the APA, the delegation of matters to the OAH is not a mandatory function but a function within the **discretion** of the administrative agency.[6] Thus, by recusing four of the six Board members, or by recusing the entire Board, the Board would have been necessarily deprived of its right to hear the matter involving Dr. Regan.

In any event, Dr. Regan, on appeal, does not point to any evidence of actual bias. He argues generalities and appearances. With respect to Drs. Lewis and Klingler, he states in his brief:

They displayed an overbearing manner, repeatedly engaged in badgering and inappropriately aggressive inquisition of

---

**6.** SG § 10–205(a)(1995) provides, in pertinent part:

(a) *To whom delegated.* (1) A board, commission, or agency head authorized to conduct a contested case hearing shall:
(i) conduct the hearing; or
(ii) delegate the authority to conduct the contested case hearing to:
1. the Office; or
2. with the prior written approval of the Chief Administrative Law Judge, a person not employed by the Office.
SG § 10–205(b)(1995) provides:
*Scope of authority delegated.*—An agency may delegate to the Office the authority to issue:
(1) proposed or final findings of fact;
(2) proposed or final conclusions of law;
(3) proposed or final findings of fact and conclusions of law;
(4) proposed or final orders or orders under Article 49B of the Code; or
(5) the final administrative decision of an agency in a contested case.

Dr. Regan and witnesses called by him to the point where the Administrative Prosecutor was constrained to object; and they sparked the effort to forage far afield in search of facts well beyond the allegations in the Charging Document.

Considering (1) the right of the Board to conduct a hearing, (2) the failure of Dr. Regan to demonstrate prejudice,[7] and (3) our inability to find specific instances of violation of due process, we cannot conclude that the general assertions of bias and improper appearance require us to reverse the circuit court's action on this issue.

## B.

Next, Dr. Regan contends that he was not given adequate notice of new facts developed at the hearing in violation of both his due process rights and the APA, SG § 10–207.[8] In

---

**7.** The advertising charge was dismissed at the beginning of the hearing, and the immoral behavior charge was dismissed later. In the end, the Board's findings related only to allowing unlicensed employees to provide chiropractic services and to billing for treatments not provided.

**8.** That section provides as follows:
    (a) *In general.*—An agency shall give reasonable notice of the agency's action.
    (b) *Contents of notice.*—The notice shall:
    (1) state concisely and simply:
    (i) the facts that are asserted; or
    (ii) if the facts cannot be stated in detail when the notice is given, the issues that are involved;
    (2) state the pertinent statutory and regulatory sections under which the agency is taking its action;
    (3) state the sanction proposed or the potential penalty, if any, as a result of the agency's action;
    (4) unless a hearing is automatically scheduled, state that the recipient of notice of an agency's action may have an opportunity to request a hearing, including:
    (i) what, if anything, a person must do to receive a hearing; and
    (ii) all relevant time requirements; and
    (5) state the direct consequences, sanction, potential penalty, if any, or remedy of the recipient's failure to exercise in a timely manner the opportunity for a hearing or to appear for a scheduled hearing.
    (c) *Consolidation of notices.*—The notice of agency action under this section may be consolidated with the notice of hearing required under § 10–208 of this subtitle.

the argument portion of his brief, however, Dr. Regan does not itemize any of the new facts that he believes violated his constitutional right to adequate notice. Aided by his Reply Brief, we assume that Dr. Regan is referring to the alleged new facts summarized at pages 6 to 7 and 9 to 11 in the Statement of Facts portion of his original brief.

 In summary, Dr. Regan asserts that the charging document did not allege all of the facts contained in the Board's findings which support the conclusion that unlicensed persons engaged in the practice of chiropractic or performed acts set forth in the statutory definition of "practice chiropractic." *See* HO § 3–101(f)(1) and (2).[9] From what we can deduce, Dr. Regan alleges inadequate notice with respect to information solicited from Laura Orem, Deborah Tibbs Tillman, and Karen Trotta.

Specifically, Dr. Regan is claiming that Laura Orem's medical records were used in a manner not alleged in the charging document. Ms. Orem was both a receptionist at the clinic and a patient of Dr. Regan. The allegations in the charging document with respect to Ms. Orem appear in paragraph N.

In its findings relating to the aiding of unlicensed individuals in the practice of chiropractic, the Board found:

C. Laura Orem worked at the Bel Air Clinic from August 1991 to July 1992 where she worked as a front desk receptionist and then trained as a chiropractic assistant, providing physical therapy which consisted of electrical

---

(d) *Publication in Register.*—For purposes of this section, publication in the Maryland Register does not constitute reasonable notice to a party.

9. Subsection (f) provides:
*Practice chiropractic.*—(1) "Practice chiropractic" means to use a drugless system of health care based on the principle that interference with the transmission of nerve impulses may cause disease.
(2) "Practice chiropractic" includes the diagnosing and locating of misaligned or displaced vertebrae and, through the manual manipulation and adjustment of the spine and other skeletal structures, treating disorders of the human body.

stimulation, hot packs and ultrasound. Orem also did patient consults, taking patient histories.

In a footnote, however, the Board stated:

Although there are allegations in the charges regarding the fact that Orem performed as a chiropractic assistant, the specifics of those duties were not set forth in the type of detail that described the unlicensed activities of the others. Orem testified that she worked as a chiropractic assistant, which testimony is supported by that of Eid and the Respondent. Therefore, although the Board notes that Orem may have performed some duties for which either training, skills or competency were required, the focus of the Board's findings and subsequent discussion will be on the Respondent's charging Orem for services not rendered.

Dr. Regan argues that the Board did not give him adequate notice of its intent to prosecute him for Ms. Orem's unlicensed participation in the practice of chiropractic. As a result, the Board erred in using Ms. Orem's medical records to elicit evidence of conduct not set forth in the charging document. We disagree. The focus of the Board's findings with respect to Ms. Orem related to improper charges for services not rendered. We perceive no error.

The Board's allegations with respect to Ms. Tillman appear in paragraph K of the charging document. The Board found that Ms. Tillman, a chiropractic assistant, received inadequate training in the use of physical therapy.

Specifically, the Board's findings were as follows:

A. Deborah Tibbs Tillman, a high school graduate, worked at the Bel Air Clinic from 1989 until 1992. While there, Tillman performed the following duties which were not authorized under the Chiropractic Act:

1. Tillman was initially assigned as a chiropractic assistant to apply adjunctive physical therapy modalities: Tillman was trained to take patients back, instruct them to gown themselves, set them up for therapy and take them from therapy to the waiting room. Thereafter, Tillman did some marketing and receptionist work. Later, Tillman

applied physical therapy modalities, such as heat, ice, ultrasound and electrical stimulation. Tillman was trained to perform physical therapy by another assistant who was unlicensed. Tillman received inadequate training in the use of physical therapy in that she was unaware of the different levels of physical therapy or uses of heat and ice to damaged tissues.

2. Subsequently, Tillman conducted consultations, taking the patients' histories, performed examinations according to an examination form used by the Respondent, which included abdominal palpations and kidney tests, decided the areas that needed to be xrayed [sic] and positioned the patients for the taking of those x-rays by the Respondent, and decided what physical therapy should be performed on patients.

3. The examinations performed by Tillman required an assessment of mobility, orthopedic and neurological functioning for which Tillman guessed at these values.

4. Tillman did not understand the clinical reasons for performing some of the tests.

5. Tillman did not undergo a systematic, documented form of training for these duties.

6. At reexaminations and final examinations, Tillman performed complete examinations and the patients were xrayed [sic] on a regular basis according to a schedule set by the Respondent. Physical therapies were performed according to a set protocol for every patient.

7. Tillman filled out reports to third party payers indicating a prognosis, some of which were changed by the Respondent.

8. The tests that Tillman performed required the use of clinical judgment for which Tillman lacked the training and competency.

Dr. Regan contends that the Board failed to provide him with adequate notice that it would seek to prove that Ms. Tillman engaged in the unauthorized practice of physical therapy. In response, the Board argues that Dr. Regan is a

chiropractor who is also licensed to perform physical therapy, and that his clinic provides both chiropractic and physical therapy services. Thus, the Board argues, the allegations in the charging document gave Dr. Regan adequate notice that it intended to prove that he improperly delegated duties to employees not authorized to perform them. We agree with the Board.

The Board's allegations with respect to Karen Trotta appear in paragraph O of the charging document. The Board's findings as to Ms. Trotta were as follows:

G. Karen Trotta, a high school graduate with one semester of college in a non-science curriculum, is a current employee of the Bel Air Clinic. Trotta first became employed there in 1991 when she was hired as a receptionist, which duties she still has as of this date as well as those of a chiropractic assistant. For approximately four months, Trotta also performed the following activities which she was unauthorized to do under the Chiropractic Act:

1. Trotta did consultations and performed initial, reexams and finals using the examination form used by the Respondent. In performing examinations, Trotta graded muscle strength.

2. Trotta was trained in examinations by Aileen Regan, an unlicensed individual.

3. Trotta completed insurance reports, with the Respondent filling out the portion regarding the patients' progress.

4. The duties which Trotta performed required professional skill and clinical judgment. The Respondent failed to document that Trotta received a systematic training program for the activities which she performed.

Dr. Regan contends that although the allegations in the charging document regarding Ms. Trotta were limited to the duties she performed as a chiropractic assistant, the Board exceeded its scope by questioning her about whether Dr. Regan billed her for chiropractic services not rendered. Dr. Regan further contends that the Board erred in finding that he failed to document the fact that Ms. Trotta had completed a

required training program, when his failure to so document was not alleged. We hold that the Board did not exceed the scope of its authority.

In an adversary proceeding, due process requires that an individual against whom proceedings are instituted be given notice and an opportunity to be heard. *Hider v. Department of Labor, Licensing and Regulation,* 115 Md.App. 258, 275, 693 A.2d 17 (1997)(citing *Burns v. Mayor of Midland,* 247 Md. 548, 553, 234 A.2d 162 (1967)), *rev'd on other grounds,* 349 Md. 71, 706 A.2d 1073 (1998). The notice must be " 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Castruccio v. Dr. Bruce Goldberg, Inc.,* 103 Md.App. 492, 496, 653 A.2d 1013 (1995)(quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)); *see also St. George Antiochian Orthodox Christian Church v. Aggarwal,* 326 Md. 90, 95, 603 A.2d 484 (1992). A court, in considering the reasonableness of notice, "must balance the interests of the state or the giver of notice against the individual interest sought to be protected by the fourteenth amendment." *Golden Sands Club Condominium, Inc. v. Waller,* 313 Md. 484, 496, 545 A.2d 1332 (1988). Thus, in determining whether notice was reasonable, a court must evaluate the specific circumstances of each case. *Id.* In administrative proceedings, reasonable notice of the nature of the allegations must be given to the party so that it can prepare a suitable defense. *Bragunier Masonry Contractors, Inc. v. Maryland Commissioner of Labor and Industry,* 111 Md.App. 698, 713, 684 A.2d 6 (1996)(quoting *Pocono Water Co. v. Pennsylvania Public Utility Commission,* 158 Pa.Cmwlth. 41, 630 A.2d 971, 973 (1993)). Moreover, SG § 10–207(a) of the APA also requires an agency to give reasonable notice of its action.

In applying the facts of the instant case to the above standard, we hold that (1) the Board gave Dr. Regan adequate and reasonable notice of the nature of the allegations, and (2) that the notice provided to Dr. Regan enabled him to prepare

■■■■■■■■■■■■■■■■

an adequate defense. Dr. Regan was apprised of the charges that he improperly allowed his employees to engage in the unauthorized practice of chiropractic and that he billed patients for treatments not rendered. The Board's findings were based on the charges and factual allegations in the charging document.[10]

## II.

██ The Board found that Dr. Regan violated HO § 3–313(18) and concluded that he "practiced with, supervised and aided several unlicensed individuals in the practice of chiropractic." Dr. Regan points to HO § 3–101(f), which defines "practice chiropractic," and asserts that there was no evidence that he delegated to any unlicensed person any of the specific matters stated in that statute and that the Board's findings do not establish a violation of the statute.

Dr. Regan also points to HO § 3–404, enacted by the General Assembly in 1982, which provides:

A licensed chiropractor may delegate duties to an assistant to the extent permitted by the rules and regulations of the Board if the assigned duties do not require the professional skill and judgment of a licensed chiropractor. The rules and regulations shall also establish qualifications for the position of chiropractic assistant.

Dr. Regan contends that HO § 3–404 was not intended to prohibit the use of chiropractic assistants, but was designed instead to give the Board the power to regulate their use.

---

**10.** On pages 10 and 11 of his brief, Dr. Regan points to twelve findings which he says were not encompassed by the allegations of fact in the Board's charging document. We have thoroughly reviewed each of those findings and have discussed many of them herein. They all relate to one or more of the following charges: (1) that Dr. Regan wilfully made or filed a false report or record in the practice of chiropractic; (2) that Dr. Regan practiced, aided, or supervised unauthorized persons in the practice of chiropractic; or (3) that Dr. Regan committed an act of unprofessional conduct in the practice of chiropractic. We hold that the Board did not exceed its authority in making any of these findings.

Although we agree, we hold that the evidence was sufficient to support a finding of violation of the statute.

Following the enactment of HO § 3–404, on July 1, 1982, the Board sent out a letter to all chiropractors regarding its policy for chiropractic assistants. In that letter, the Board stated that it was in the process of developing formal rules and regulations regarding the delegation of duties to chiropractic assistants. The Board then went on to describe the policy considerations on which the formal rules would be based. In pertinent part, the letter described the policy considerations as follows:

> The Board at its June 10, 1982 meeting unanimously agreed on certain policy concepts concerning assistants. Under no circumstance shall a licensed Chiropractor delegate responsibility of diagnosis, manipulative therapy, any evaluation or testing method requiring clinical judgement and nutritional program development or evaluation. Under all circumstances the licensed Chiropractor must directly supervise one's assistants. This means the Chiropractor must be on the office premises immediately available to give aid, direction and instruction when procedures or activities are performed. An assistant may perform secretarial, clerical and housekeeping duties without the direct supervision of a licensed Chiropractor. Also, an assistant may help with patient related activities that do not involve treatment (i.e. transporting patients, undressing and dressing patients, removing and applying assistive and supportive devices) without direct supervision of a licensed Chiropractor.

> There shall be documented evidence of sufficient in-service training to assure safe performance of the duties and procedures assigned to the assistant. Our first concern is for safety of the patient, therefore the licensed Chiropractor is responsible for the proper supervision and training of their assistants. Examination, x-ray and physiological therapeutic duties may be assigned **so long as they do not require the judgement and/or professional expertise of a licensed Chiropractor.** (Emphasis added)

No such rules and regulations were adopted by the Board until after the events herein occurred. Consequently, the only restriction on Dr. Regan was as defined by HO § 3–101(f). Stated another way, Dr. Regan was subject to the restriction that he could not practice chiropractic with an unauthorized person or supervise or aid an unauthorized person in the practice of chiropractic. *See* HO § 3–313(18). Moreover, Dr. Regan was under an obligation to delegate only those duties that did not require the judgment and professional expertise of a licensed chiropractor. *See* HO § 3–404.

In rendering its decision, the Board applied the existing standard of practice and not a new standard. In relevant part, the Board found:

N. As noted in the Board's July 1, 1982 letter, the delegation of duties to unlicensed individuals are those not requiring professional skills and judgment. Such duties include the taking a preliminary history and assisting with the positioning of the xray [sic] beam. However, it is not consistent with sound chiropractic practice for a licensee to permit unlicensed staff to perform the entire consultation, determine areas that need to be xrayed [sic] and position patients for same, conduct a full examination involving range of motion, orthopedic, sensory evaluations and neurological assessments, and to determine what types of physical therapy are needed based upon those examinations.

\* \* \*

32. The Board's July 1, 1982 letter upon which the Respondent presumably relied, allowed delegation of duties not requiring professional skills and judgment. The consultation, decision on which x-rays to take and how many views, the orthopedic, neurological and palpation tests all required professional skills, clinical judgement and training. Testing should include determining pathological problems which the non-chiropractic school graduates were not trained to do. This was an inappropriate delegation of duties to unlicensed persons.

\* \* \*

33. The inappropriate delegation of duties to unlicensed persons was exacerbated by the Respondent's failure to document that these individuals had received a systematic training, pursuant to the Board's July 1, 1982. The Respondent had no documented, standardized training program. Training by observation and a cursory repetition of tests is insufficient training. Training by Holdcroft, Aileen Regan and Chavis, and other unlicensed individuals does not comport with applicable professional standards of practice.

There was testimony to support the Board's findings and conclusions based on the existing standard of practice and not a new standard, particularly from the expert witness, Dr. Blaise M. La Vorgna. We, therefore, hold that the Board did not err in finding that Dr. Regan's employees engaged in the unauthorized practice of chiropractic.

## III.

Although we affirm the Board's decision insofar as it relates to violations of the Maryland Chiropractic Act, we vacate the Board's decision with respect to the sanctions imposed against Dr. Regan.[11] During oral argument, Dr. Regan's counsel

---

11. The Board

ORDERED that the Respondent's license to practice chiropractic with the right to practice physical therapy be and is SUSPENDED for two years; and be it further

ORDERED that following the suspension, the Respondent shall be placed on PROBATION for three years, subject to the following conditions:

1. That the Respondent's practice be supervised by a mentor pre-approved by the Board from a list of three names submitted by the Respondent at least three months prior to the termination of the suspension period and that that mentor submit quarterly reports to the Board on the Respondent's practice according to terms set forth by the Board.

2. That the Respondent perform 100 hours of community service with an agency preapproved by the Board, which completion of service shall be documented to the Board.

3. That the Respondent pay a penalty of $5000 to the general fund of the State of Maryland.

informed this Court that, by agreement of the parties, the Board's order has been stayed and that (1) for the last two and a half years, Dr. Regan's practice has been monitored by a Board-approved mentor (Dr. La Vorgna—the Board's expert witness), and (2) to date all the mentor's findings have been favorable.

Considering that Dr. Regan has already served what is in effect a probationary period almost equal to that ordered by the Board, apparently without incident, we are not affirming the Board's order as to sanctions. Because we have found no error, it is not our prerogative to consider whether the Board's order should be modified. We believe, however, that the Board should consider whether the sanctions previously imposed remain appropriate or should be modified. The Board should state the reasons for its conclusion. Consequently, we vacate the portion of the order regarding sanctions and remand this case for further proceedings. *See Lucke v. Commissioner of Personnel,* 245 Md. 706, 709, 228 A.2d 313 (1967)(per curiam)(when justice requires, a court can remand a case to an administrative agency for further proceedings); *Maryland State Retirement Agency v. Delambo,* 109 Md.App. 683, 691–92, 675 A.2d 1018 (1996).

**JUDGMENT VACATED WITH RESPECT TO SANCTIONS, OTHERWISE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND TO THE STATE BOARD OF CHIROPRACTIC EXAMINERS FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLANT.**

---

4. That in addition to any Continuing Education Units (CEUs) required for licensure renewal, the Respondent take 12 hours each in business ethics, medical ethics and patient relations.

5. That during the probationary period, the Respondent may not supervise any chiropractic assistants.