**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Karl J. BRAY, Defendant-Appellant.**

**No. 75–1932.**

United States Court of Appeals,
Tenth Circuit.

Submitted Sept. 24, 1976.

Decided Dec. 6, 1976.

Max D. Wheeler, Asst. U. S. Atty., Salt Lake City, Utah (Ramon M. Child, U. S. Atty., Salt Lake City, Utah, on the brief), for plaintiff-appellee.

James N. Barber, Meredith, Barber & Day, Salt Lake City, Utah, for defendant-appellant.

Before SETH, BREITENSTEIN and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Karl J. Bray (Bray) appeals from a jury conviction of violating 26 U.S.C.A. § 7203 (wilful failure to file an income tax return) and 26 U.S.C.A. § 7205 (wilful falsification of a tax withholding statement).

Bray is a tax protester. He authored a booklet entitled "Taxation and Tyranny," which is, allegedly, "the complete guide to the tax rebellion." It "describes the tactics that particular Americans are using to stop the unjust, unconstitutional, and tyrannical practices of the I.R.S."

Bray's 1972 federal income tax return did not contain any relevant information of his earnings. Rather, the return was inscribed: "5th Amendment. Go to Hell; do not pass go; do not collect $200 dollars." On appeal Bray admits that he did not comply with the general filing requirements of the Internal Revenue Code (Code) and that he claimed 15 exemptions, even though he was entitled only to one.

The Government introduced an overwhelming quantity of evidence relative to Bray's taxable income for the year 1972. The parties stipulated that $2,050 was the amount of gross income required as a precondition of Bray's duty to file. In proving Bray's 1972 income the Government introduced payroll records, bank account identification cards, bank account statements and numerous copies of cancelled checks. These records and documents were utilized to reconstruct Bray's income in accordance with the "bank deposits and cash expenditures" method of proof.

Bray testified in his defense. He contended that he was justified in not filing a proper return and in inflating the number of his exemptions because: he thought he was under investigation for criminal violations of the Code and that filing a return would tend to incriminate him in violation of his Fifth Amendment rights; he was not satisfied that he had taxable income in excess of $2,050; he felt that the only way he could require the United States Government to stop withholding taxes was to inflate the number of his claimed exemptions; his personal filing with the Internal Revenue Service "had been designed as political protests designed as good faith challenges"

of that which he viewed as unconstitutional and "bad laws."

On appeal Bray contends that the Court erred in: (1) refusing to suppress evidence secured by administrative summons; (2) permitting the Government to establish his 1972 income by the "bank deposits and cash disbursements" method of proof; and (3) in refusing to disqualify itself for personal bias and prejudice.

## I.

Bray contends that the Court erred in refusing to suppress evidence procured by the Internal Revenue Service (IRS) by administrative summonses issued pursuant to 26 U.S.C.A. § 7602, which provides in pertinent part:

> For the purposes of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—
> (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;
> (2) To summon the person liable for tax or required to perform the act . . . or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, . . .

Bray concedes that Section 7602 may be properly utilized for the joint purpose of acquiring information for the establishment of civil tax liability or collection as well as the possibility of criminal prosecution. Bray contends, however, that in this case the sole purpose of the summons was aimed at the procurement of evidence against him for purposes of criminal prosecution. On this predicate, Bray argues that the summons is not enforceable. We agree that an administrative summons may not be enforced if the sole purpose therefor is that of obtaining evidence for purposes of criminal prosecution. We hold, however, that based upon the facts presented in this record, the summonses were properly employed. No abuses occurred.

The record clearly demonstrates that the IRS investigation of Bray and the Service's related use of administrative summonses were not undertaken for the sole purpose of obtaining evidence for criminal prosecution of Bray. Bray's cross-examination of Special Agent Harkness is significant to this dispute:

Q. What is the purpose of your job?

A. Well, my purpose of my job is to determine the tax liability of an individual and also determine if there are possible criminal violations of the Internal Revenue Code.

Q. It is a fact, is it not, that these two aspects of your job are integrally related and that the purpose of determining tax liability as far as your job is concerned, is to determine criminal liability, is that true?

A. I have to determine tax liability before I can determine whether there is a criminal violation, yes.

*Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), supports our holding that the summonses were properly utilized in the case at bar:

> We note initially that . . . the courts of appeals in opinions . . . appear uniformly to approve the use of a summons in an investigation that is likely to lead to civil liability as well as to criminal prosecution. . . . On the other hand, it has been said, . . . that where the sole objective of the investigation is to obtain evidence for use in a criminal prosecution, the purpose is not a legitimate one and enforcement may be denied. This, of course, would likely be the case where a criminal prosecution has been instituted and is pending at the time of the issuance of the summons.

400 U.S., at 532–533, 91 S.Ct. at 543.

\* \* \* \* \* \*

We hold that under § 7602 an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to the recommendation for criminal prosecution.

400 U.S., at 536, 91 S.Ct. at 545.

Although not directly raised by Bray, the Government contends that not only were the summonses properly authorized and executed, but that Bray was without *standing* to challenge their issuance and usage. The Government contends that inasmuch as the summonses were issued to corporations or individuals doing business with Bray, and that none were issued to Bray or aimed at records in Bray's possession, that Bray has no standing to assert the Fifth Amendment privilege. The proposition that the Fifth Amendment prevented compelled production of documents over the objection of the rightful claimant that such production might incriminate him had its origin in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). The application of the *Boyd* rule was laid to rest in the recent United States Supreme Court opinion entitled *Fisher, et al. v. United States, et al.; United States, et al. v. Kasmir, et al.* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) where the Court upheld administrative summonses directing attorneys for the respective taxpayers to deliver over certain documents such as accountants' analyses of the taxpayers' income and expenses, work papers, retained copies of prior income tax returns, reports, correspondence, and other records of the accountants which had been delivered to the respective attorneys by the accountants employed by the taxpayers, at the specific direction of the taxpayers. In each case, the Internal Revenue Service had interviewed the taxpayers in connection with an investigation of possible civil or criminal liability under the federal income tax laws before the documents were delivered to the taxpayers' attorneys. The taxpayers invoked the Fifth Amendment privilege against self-incrimination and the attorney-client privilege. The Supreme Court rejected both contentions in holding that the subpoenae are enforceable and that directing a taxpayer to produce his account-

ant's documents, etc. relating to his tax affairs would not involve incriminating testimony within the protection of the Fifth Amendment because (a) under such circumstances the taxpayer-accused is not compelled to make any testimonial communication and (b) the accountants' documents, etc., are not the "private papers" of the taxpayers but are the contents of the accountants' work papers and do not, therefore, involve testimonial self-incrimination, however incriminating the contents may be.

■ By analogy, we have held that there is no violation, per se, of one's Fifth Amendment privilege against self-incrimination by reason of the proper execution by special agents of the IRS of a valid search and seizure warrant seeking fiscal and business records relating to income and expenses in the possession of taxpayers in the course of an IRS investigation of their income tax liabilities before any criminal charges had been filed. *Shaffer v. Wilson*, 523 F.2d 175 (10th Cir. 1975). In *Shaffer* we referred with favor to *United States v. Blank*, 459 F.2d 383 (6th Cir. 1972), cert. denied, 409 U.S. 887, 93 S.Ct. 111, 34 L.Ed.2d 143 (1972), where the Court made these observations relative to the element of "compulsion" in relation to records, etc. obtained from the taxpayer by administrative summons (subpoena) as distinguished from those obtained via a valid search warrant:

. . . The subpoena compels the person receiving it by his own response to identify the documents delivered as the ones described in the subpoena. The search warrant involved no such element of compulsion upon an actual or potential defendant.

459 F.2d, at 385.

The summonses were properly issued and executed herein. *See also United States v. Hansen Niederhauser Co., Inc.*, 522 F.2d 1037 (10th Cir. 1975) and *United States v. Richardson*, 469 F.2d 349 (10th Cir. 1972).

## II.

■ Bray contends that the court erred in permitting the Government to prove his

1972 income by the "bank deposit and cash disbursements method of proof" (bank deposit). The "net worth method of proof" approved in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) preceded the bank deposit method of proof approved in *United States v. Lacob*, 416 F.2d 756 (7th Cir. 1969), cert. denied, 396 U.S. 1059, 90 S.Ct. 755, 24 L.Ed.2d 754 (1970) and re-affirmed in *United States v. Stein*, 437 F.2d 775 (7th Cir. 1971), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). Bray acknowledges that the court properly stated the rule in instructing the jury.

Bray argues that the bank deposit method of proof is no longer proper under the dictates of *Mullaney v. Wilbur*, 421 U.S. 684, 96 S.Ct. 1881, 44 L.Ed.2d 508 (1975). He specifically contends that the method is not proper herein because some of the information utilized in the implementation of the method should have been suppressed. *Mullaney, supra,* struck down as unconstitutional a Maine statute which shifted the burden of proving that a homicide was committed in the heat of passion under sudden provocation to the accused, in order to reduce a criminal homicide from murder to manslaughter. By analogy, Bray contends that the bank deposit method of proof unconstitutionally shifts the burden of proof to defendants in tax cases. We hold that the utilization of the bank deposit method of proof was proper and was not violative of Bray's constitutional rights.

Independent of the evidence introduced by the bank deposit method of proof, the Government introduced direct evidence that Bray had earned commissions of $5,580.00 in 1972.

Bray contends that the bank deposit type of evidence creates a *presumption* that must be rebutted. However, the court properly instructed that simply an *inference* could be drawn that certain figures constitute income. We recognize that the bank deposits method of proof is not an exact science. In our judgment, however, its utilization has established a substantial degree of certainty which might otherwise be un-

known. In *United States v. Stein, supra,* the court upheld the exclusive use of the "bank deposit" method to establish a wilful attempt to evade and defeat income taxes. The court observed:

In tax evasion cases, a not uncommon attribute seems to be a lack of precise and clear recordation and documentation. . . . Whether the scarcity, murkiness, or ambiguity of supporting data in any particular case is purposeful or merely inadvertent is no doubt often a matter to which the trier of fact gives some determinative consideration.

\* \* \* \* \* \*

Defendant first argues that the government's use of the bank deposit method was insufficient to show substantial unreported income in 1963. While unexplained deposits in excess of reported income is not alone proof of unreported income, it is "a rather convincing circumstance in support of the charge."

. . .

"Of course, proof under the bank deposit theory is circumstantial in nature, but we know of no reason why such deposits may not be considered in determining income, when there is no evidence they represent anything other than income."

437 F.2d at 778.

We have consistently approved the principle underlying the bank deposit method of proof theory. In *United States v. Ramsdell*, 450 F.2d 130 (10th Cir. 1971) we held that circumstantial evidence, including complete failure to maintain adequate records, was sufficient to establish a defendant's wilful intent to evade and defeat income taxes owing. We have held that the existence of unexplained funds in the hands of a taxpayer establishes a prima facie case of understatement of income rendering it incumbent on the taxpayer to overcome logical inferences to be drawn from such facts. *United States v. Garcia*, 412 F.2d 999 (10th Cir. 1969); *Graves v. United States*, 191 F.2d 579 (10th Cir. 1951). We have recognized proof of tax evasion by the "specific items method" under which it is shown that contrary to usual practices a defendant re-

ceived certain payments in cash from particular customers which were not in turn reported on income tax returns. *United States v. Merrick,* 464 F.2d 1087 (10th Cir. 1972), cert. denied, 409 U.S. 1023, 93 S.Ct. 462, 34 L.Ed.2d 314 (1972). By these standards we hold that the Government properly utilized the "bank deposit and cash disbursement method of proof" to reconstruct Bray's income for 1972.

### III.

Bray alleges that the district court judge erred in refusing to disqualify himself, and that he should have disqualified himself prior to trial. Bray's brief on appeal argues that "Judge Ritter's conduct of this trial was atrocious." However, he recanted, at least in part, when he observed " . . . the court's conduct in the presence of the jury during October 16th was not only free of substantial error, but almost exemplary."

Bray moved for disqualification pursuant to 28 U.S.C.A. § 144 which provides, in part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The simple filing of an affidavit does not automatically disqualify a judge. *United States v. Townsend,* 478 F.2d 1072 (3rd Cir. 1973). A trial judge has as much obligation not to recuse himself when there is no reason to do so as he does to recuse himself when the converse is true. *United States v. Ming,* 466 F.2d 1000 (7th Cir. 1972), cert. denied, 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176 (1972); *United States v. Diorio,* 451 F.2d 21 (2nd Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). An affidavit must comply with § 144 before it can effectively disqualify a judge. *United States v. Anderson,* 433 F.2d 856 (8th Cir. 1970). And although a court must pass on the legal sufficiency of an affidavit, [*Wolfson v. Pal-*

*mieri,* 396 F.2d 121 (2d Cir. 1968)], all factual allegations must be taken as true [*Action Realty Co. v. Will,* 427 F.2d 843 (7th Cir. 1970)], notwithstanding a judge's desire to challenge the validity of the affidavit. *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation,* 507 F.2d 1281 (8th Cir. 1974).

Bray's affidavit of prejudice alleged, *inter alia,* that he had obtained 2000 signatures of persons desiring the removal of the judge; that he had written an article calling for the impeachment of the judge; that he had a prior case dismissed by the judge; that he had written a protest telegram against the judge; and that he had filed a brief with the court accusing the judge of bribery, conspiracy, and the obstruction of justice. Bray argues that these actions prejudiced the judge against him or that they "must have" so prejudiced the judge.

Affidavits of disqualification must allege personal rather than judicial bias. *United States v. Thompson,* 483 F.2d 527 (3rd Cir. 1973). They must contain more than mere conclusions. They must show facts indicating the existence of a judge's personal bias and prejudice. *Knoll v. Socony Mobil Oil Company,* 369 F.2d 425 (10th Cir. 1966), cert. denied, 386 U.S. 977, 87 S.Ct. 1173, 18 L.Ed.2d 138 (1967); *Inland Freight Lines v. United States,* 202 F.2d 169 (10th Cir. 1953). Motions alleging bias and prejudice on the part of a judge which establish simply that the affiant does not like a particular judge are not adequate to require disqualification. *United States v. Goeltz,* 513 F.2d 193 (10th Cir. 1975), cert. denied, 423 U.S. 830, 96 S.Ct. 51, 46 L.Ed.2d 48 (1975).

We hold that Bray's affidavit in support of his motion to disqualify the judge was insufficient. The mere fact that a judge has previously expressed himself on a particular point of law is not sufficient to show personal bias or prejudice. *Antonello v. Wunsch,* 500 F.2d 1260 (10th Cir. 1974). Nor are adverse rulings by a judge grounds for disqualification. *Martin v. United States,* 285 F.2d 150 (10th Cir. 1960), cert.

858

denied, 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 816 (1961). Prior written attacks upon a judge are likewise legally insufficient to support a charge of bias or prejudice on the part of a judge toward an author. In *United States v. Garrison,* 340 F.Supp. 952 (E.D. La.1972), the Court observed:

> Movant's second ground alleged to support the motion for recusal—his own press release denouncing the federal judiciary and this court's opinion in the *Shaw* case—is similarly inadequate. It is well settled that prior written attacks upon a judge are legally insufficient to support a charge of bias or prejudice on the part of the judge toward the author of such a statement. *In re Union Leader Corp.,* 292 F.2d 381, 389 (1st Cir.), cert. denied, 368 U.S. 927, 82 S.Ct. 361, 7 L.Ed.2d 190 (1961), noted in 8 Utah L.Rev. 75 (1962); *United States v. Fujimoto,* 101 F.Supp. 293, 296 (D.Hawaii 1951), motion for leave to file petition for writ of prohibition or mandamus denied, *Fujimoto v. Wiig,* 344 U.S. 852, 73 S.Ct. 102, 97 L.Ed. 662 (1952).

> The reasoning behind these decisions is not difficult to ascertain. As one jurist in a similar case stated:

>> "Only a psychic pleader could allege that because a defendant has published uncomplimentary statements concerning a judge, the latter will be unable to give his critic a fair and impartial trial. If such a fantastic procedure were permitted, a defendant could get rid of a judge by the simple expedient of publishing a scurrilous article, *truthfully* alleging that the article was published, and clinching the matter by asserting the bald conclusion that, since the article was uncomplimentary, the judge must of necessity be prejudiced against the publisher!"

*United States v. Fujimoto, supra,* 101 F.Supp. at 296. The mere fact that a defendant has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced, the standard used to test the sufficiency of an affidavit for recusal under section 144. *Berger v. United States, supra,* 255 U.S. at 33–35, 41 S.Ct. at 233, 65 L.Ed. at 485; *United States v. Hoffa,* 245 F.Supp. 772, 778 (E.D.Tenn.1965). To allow prior derogatory remarks about a judge to cause the latter's compulsory recusal would enable any defendant to cause the recusal of any judge merely by making disparaging statements about him. Such a bizarre result clearly is not contemplated in section 144.

340 F.Supp., at 957.

We hold that Bray's affidavit was inadequate to establish prejudice and bias warranting recusal by the trial judge.

 Bray refers to certain colloquies which took place out of the presence of the jury[1] which he contends show that the judge was prejudiced and should have recused himself and that by reason of his participation, he was denied a fair trial. The comments cited, although admittedly not models of judicial restraint and decorum, do not give rise to reversible error. A trial court has the power to direct a trial along recognized lines of procedure in a manner reasonably thought to bring about a just result; and non-prejudicial comment may be made by the court during trial. *Lowther v. United States,* 455 F.2d 657 (10th Cir. 1972), cert. denied, 409 U.S. 857, 93 S.Ct. 139, 34 L.Ed.2d 102 (1972). Even though not condoned and certainly not encouraged we have nevertheless held: that a judge's remark characterizing defense counsel's statement as "ridiculous" did not give rise to reversible error, *Cooper v. United States,* 403 F.2d 71 (10th Cir. 1968); that a judge's comment on the "pathetic" nature of a witness was not prejudicial, *Whitlock v. United States,* 429 F.2d 942 (10th Cir. 1970); and that a judge's request that counsel examine his witness "without beating around the bush" did not constitute plain error or prejudice the defendants. *United States v. MacKay,* 491 F.2d 616 (10th Cir. 1973), cert. denied, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974). The complaints

1. See Appendix.

made by Bray do reflect the judge's attitude and reactions to specific incidents occurring at trial. They involve comments by the judge, when goaded, which were unjudicial. To sustain disqualification under § 144, *supra,* there must be demonstrated bias and prejudice of the judge arising from an "extrajudicial source" which renders his trial participation unfair in that it results in an opinion formed by the judge on the merits on some basis other than that learned from his participation in the case. *United States v. Grinnell Corporation,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Davis v. Cities Service Oil Company,* 420 F.2d 1278 (10th Cir. 1970).

While the trial court's comments in the cases cited above, made in the presence of the jury, were generally deemed improper, they were not seen as plain error requiring new trial or reversal. *See:* 34 A.L.R.3d 1313; 14 A.L.R.3d 723; 62 A.L.R.2d 166; 84 A.L.R. 1172; 65 A.L.R. 1270.

We hold that the appendixed colloquies did not deny Bray a fair trial.

## IV.

Bray contends that the court erred in setting his bail in the presence of the jury at the conclusion of the first day of trial. The Government "agree[s] that this conduct in front of the jury was improper." The entire colloquy relating to the matter is:

THE COURT: Is this fellow, Bray, in custody?

MR. BARBER: He is not, your Honor.

THE COURT: Why isn't he?

MR. BARBER: At this time he is at liberty on his own recognizance on this charge, your Honor.

MR. WHEELER: He was brought in pursuant to a summons, your Honor. Bail was never set at that time.

THE COURT: Well, bail is set now. $50,000 bail. If you can put up 10 percent of that with the clerk, you can be released. Otherwise, lock him up.

[R., Vol. I, pp. 93, 94.]

We hold that the court committed plain error in setting Bray's bail in the presence of the jury. The record is devoid of any justification for conducting the bail proceeding in the presence of the jury. There is nothing to indicate that the action was necessary to avoid "the danger of significant interference with the progress or order of the trial." The proceedings lent nothing to the truth finding function. By setting bail within the jury's presence and admonishing the marshals to "lock him up" if bail was not met, the court effectively vitiated the presumption of innocence. We are unaware of any reported decision upholding such proceedings in the presence of the jury. A trial judge has both great responsibility and discretion in conducting the trial of a case. He should be the exemplar of dignity and impartiality. He must exercise restraint over his conduct and statements in order to maintain an atmosphere of impartiality. We are cognizant of the strain and emotional stress imposed upon a trial judge who is endeavoring to conduct the trial in a firm, dignified and restrained manner when he is confronted by a litigant who, like Bray, treats him with disrespect and who openly insults and humiliates him. Even so, it is prejudicial error for the judge to make remarks that clearly import his feelings of hostility toward the defendant. The remarks of the trial judge relative to Bray's bond, with the inferences which must be drawn, cannot be justified or rationalized as fair and impartial. These remarks constitute plain error. Fed.Rules Crim.Proc., Rule 52(b), 18 U.S. C.A.; *United States v. MacKay, supra; United States v. Wheeler,* 444 F.2d 385 (10th Cir. 1971). Bray's motion for mistrial, filed the day following the first day of trial, complains of prejudicial remarks of the trial judge made during the course of the first day of proceedings. That motion was ignored by the trial court. We hold that it should have been heard and granted.

The standard for revocation of bail is set forth in *Bitter v. United States,* 389 U.S. 15, 88 S.Ct. 6, 19 L.Ed.2d 15 (1967):

A trial judge indisputably has broad powers to ensure the orderly and expeditious progress of a trial. For this pur-

pose, he has the power to revoke bail and to remit the defendant to custody. But this power must be exercised with circumspection. It may be invoked only when and to the extent justified by danger which the defendant's conduct presents or by danger of significant interference with the progress or order of the trial.* . . .

* It does not appear whether defendant was at large on bail at the time of the order remitting him to custody. But the same principle would apply if he had been at liberty on his own recognizance.

389 U.S., at 16, 88 S.Ct., at 7.

■ This case has been before the same trial judge twice. We do not challenge or question the integrity of the judge. However, under the totality of the facts and circumstances of this case, there is a real likelihood that the same trial judge's impartiality might reasonably be at issue under the terms of 28 U.S.C. § 455(a) which, as revised in 1974, disqualifies any judge from presiding in " . . . any proceeding in which his impartiality might reasonably be questioned." We conclude that the demands of justice require that the cause be retried before another judge.

Reversed and remanded for new trial in accordance with the foregoing views with direction that the cause be retried before another judge.

## APPENDIX

The following colloquy occurred prior to trial, out of the presence of the jury:

MR. BRAY: Excuse me, your Honor. May I address the Court?

THE COURT: No, you may not.

MR. BRAY: Have you read my motions, your Honor?

THE COURT: You bet.

MR. BRAY: Thank you.

THE COURT: I also read the charge you have against me that I accepted a $20,000 bribe.

MR. BRAY: Did you—

THE COURT: Yes.

MR. BRAY: Accept the bribe?

THE COURT: Keep that jury out there. You're a damned impertinent bird. You come forward. You have just gotten yourself in contempt of this court.

MR. BRAY: I didn't mean any disrespect, your Honor.

THE COURT: No, you didn't mean any disrespect saying that I received a $20,000 bribe?

MR. BRAY: I truly believe that you did, your Honor. And that is why I made the allegation.

THE COURT: Yes, all right.

MR. BRAY: That is also why I filed an affidavit of prejudice. And I wish you had recused yourself in this matter.

THE COURT: Oh, you did.

MR. BRAY: Yes.

THE COURT: Let me tell you, you are in contempt of this court. And moreover, I am going to sue you now on the criminal side of the court and have somebody else try it. And I am going to sue for criminal contempt. But I am going to have a civil contempt against you right here and now. As soon as this case is over, I am going to give you the business on that.

It is about time that somebody took this fellow, Karl Bray, and put him where he belongs. And I am going to do it. He has the effrontery to come here in my own courtroom and repeat it, repeat it.

MR. BRAY: Well, I would respectfully move that—

THE COURT: You just don't talk to me about respect. You take your seat over there, and we will try it. You, too.

MR. BARBER: Thank you, your Honor.

THE COURT: Bring that jury in.

Don't hold any conference there about that matter.

MR. BARBER: We are not, your Honor. We are talking about other matters.

THE COURT: I have had about enough of you, too, Barber. While I am cleaning up the situation around the federal courthouse here, I want to take you with it.

All right.

The following colloquy occurred after trial out of the presence of the jury and prior to verdict:

THE COURT: All right. Motion denied to both the close of the government's proof and the other. I don't think you are entitled to a judgment of acquittal. I do think the evidence is overwhelming. I don't think he has a defense. If this had been a civil case, I would have directed the verdict on the subject. I don't think he has any defense.

Now this is an unfortunate young man, going around raising Hell the way he has been doing one way and another.

Now I direct the United States Attorney to proceed to prosecute this man for criminal contempt based upon his charge that this judge accepted a $20,000 bribe from somebody.

You see, he puts his foot in his mouth. He stated that again in front of me in the presence of the court here yesterday. That is what we will base it upon. That is contemptuous conduct of a criminal character in the presence of the court.

Now, I want that done. And that isn't all that is going to be done. He had the effrontery to say to me yesterday, "You took a bribe; didn't you?" Well, I have not felt it worth denying. I let the Tribune editorial take care of that. I was kind of pleased with that. I didn't invite it, none of my friends invited it.

The Salt Lake Tribune ran a nice editorial and said, "Not Judge Ritter. He didn't accept any money or bribe."

And you are damn right he didn't. And you are going to have an opportunity to talk about your Constitutional rights. You are not only going to have an opportunity, you are going to have to.

MR. BRAY: That is all I ever wanted was an opportunity to get into court.

THE COURT: Well, all right. You will get into court. You are damn right you will get into court. And if you could fly to the moon on your toothpick, you will succeed in proving that I took a bribe of 20 cents from anybody, anytime, anywhere.

I have been on this bench 27 years, and to have a whippersnapper like you come along and make a groundless charge of that kind, an utterly groundless charge, you won't be in court soon, however. I will take care of that as soon as I get this jury's verdict. You are going to be in the penitentiary for as long as I can give you, I will tell you that.

MR. BRAY: Why don't we go to court before I go to jail and get it over with?

THE COURT: Thank you very much for such a generous suggestion. Young man, you would be damn well advised to keep your mouth shut. Just damn well advised to keep your mouth shut. Now, you are getting some other people in trouble, too. I am going to join everybody that published that in any way. So you can count on that. Chew on that for awhile.

Take that fellow into custody.