735 A.2d 991

Brian REGAN

v.

The STATE BOARD OF CHIROPRACTIC EXAMINERS.

No. 75, Sept. Term, 1998.

Court of Appeals of Maryland.

Aug. 24, 1999.

398

Carol L. Rubin (Eric M. Newman, Fisher & Winner, L.L.P., on brief), Baltimore, for petitioner.

Cynthia G. Peltzman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

ELDRIDGE, Judge.

We issued a writ of certiorari in this administrative law case primarily to consider whether two members of the Maryland

---

* Chasanow, J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion

Board of Chiropractic Examiners were required to have recused themselves from a chiropractor's disciplinary hearing.

## I.

Dr. Brian Regan has been licensed since 1987 by the Maryland Board of Chiropractic Examiners to practice chiropractic with the right to practice physical therapy. Dr. Regan began to work for the Yalich Clinic of Bel Air in 1987 and, in 1991, became the owner of the chiropractic portion of the clinic. From 1989 through 1992, Dr. Regan supervised and hired workers at both the chiropractic clinic and the rehabilitation clinic. During this supervisory period, Dr. Regan practiced with, supervised, and aided several unlicenced individuals in the practice of chiropractic. These unlicenced persons consisted of recent chiropractic school graduates as well as persons with little or no training in chiropractic or physical therapy. The unlicenced workers engaged in the practice of chiropractic by performing consultations, taking patient histories, conducting examinations, deciding upon areas to be x-rayed and taking x-rays, determining that physical therapy should be performed, applying physical therapy modalities, and filling out insurance report forms. Dr. Regan had no documented, standardized training program for these persons. The tests performed by them were used by Dr. Regan to form a diagnosis which was used to determine a treatment plan for a patient.

In the spring of 1993 the Board commenced an investigation into Dr. Regan's practice of chiropractic. While under investigation, Dr. Regan allegedly asked the regional manager of the Yalich Clinic, Joan Gee, to seduce Dr. Howard Lewis and Dr. Brent Owens, both members of the Board at the time, and Dr. John Hughes, President of the Maryland Chiropractic Association, in order to jeopardize the Board's proceedings. Dr. Regan allegedly told Ms. Gee that, if she did not try to entice Dr. Lewis into having a sexual liaison with her, she would lose her job. Ms. Gee made an appointment at Dr. Lewis's clinic and went to his clinic but did not try to seduce him. Ms. Gee also made appointments with both Dr. Owens and Dr. Hughes

at their respective offices, but she did not keep these appointments. In addition, Dr. Regan allegedly asked his sister, Aileen Regan, who worked for him, to go to the office of Dr. Lewis to entice him into having a sexual liaison with her. His sister declined this request.

On July 7, 1994, the Board charged Dr. Regan with violations of the Maryland Chiropractic Act, Maryland Code (1981, 1994 Repl.Vol.), § 3–101 *et seq.* of the Health Occupations Article. In support of its charges, the Board alleged that Dr. Regan hired, supervised, and aided unlicenced persons in the practice of chiropractic by allowing unlicenced employees to conduct examinations and consultations, take x-rays, and write reports. In addition to the unauthorized practice allegations, the Board averred that Dr. Regan made and submitted false reports when he billed for services not actually performed and instructed his employees to falsify reports submitted to third party payors in order to prolong treatment. The Board further charged Dr. Regan with "soliciting employees for the sole purpose of obtaining information to use against the Board" through the alleged seduction scheme. Finally, the Board charged Dr. Regan with advertising in a misleading manner because he submitted newspaper advertisements in 1993 for free pain evaluations at the Yalich Clinic without listing his name or the name of any licensed chiropractor associated with the clinic.

According to the Board's charges Dr. Regan violated the following provisions of Code (1981, 1994 Repl.Vol.), § 3–313 of the Health Occupations Article:

"Subject to the hearing provisions of § 3–315 of this subtitle, the Board may deny a license to any applicant, reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the applicant or licensee:

(7) Solicits or advertises in a false or misleading manner or in any other manner not approved by the Board;

(8) Is unethical in the conduct of the practice of chiropractic;

(12) Wilfully makes or files a false report or record in the practice of chiropractic;

(18) Practices chiropractic with an unauthorized person or supervises or aids an unauthorized person in the practice of chiropractic;

(19) Violates any rule or regulation adopted by the Board;

(20) Behaves immorally in the practice of chiropractic;

(21) Commits an act of unprofessional conduct in the practice of chiropractic."

The Board also charged Dr. Regan with violating § 3–407 of the Health Occupations Article and COMAR 10.43.03, both of which concern misleading advertising.

Prior to the administrative hearing, Dr. Regan moved to disqualify the entire Board. At the time, the Board of Chiropractic Examiners consisted of six members, and at least four members were required for a quorum. A quorum must be present in order to hear a matter. *See* §§ 3–202(a) and 3–204(a) of the Health Occupations Article. Of the six members, one consumer member, David Carey, Esq., recused himself because his law firm had previously handled a criminal matter involving Dr. Regan's office manager, who was to testify at the proceedings. Dr. Regan argued that Dr. Lewis should recuse himself because of the Board's allegations that Dr. Regan orchestrated a seduction plot against him.[1] Dr. Regan also sought the recusal of Dr. Audie Klinger because Dr. Klinger purportedly telephoned Dr. Regan to inform him that one of Dr. Regan's 1993 newspaper advertisements did not comply with the Board's regulations. Dr. Regan immediately changed the advertisement in order to comply. Dr. Regan asserted in his motion that Dr. Klinger led him to believe that, if the advertisement was changed immediately, Dr. Regan would not be subject to disciplinary action because of the matter. Dr. Regan moved to recuse Dr. Florence Blanck

---

1. Dr. Owens, another alleged target of Dr. Regan's seduction plot, was no longer a Board member at the time of the motion and hearing.

because Dr. Regan intended to call her as a witness to testify as to the Board's proposed regulations governing chiropractic assistants. Dr. Regan further sought the recusal of Dr. Paul Goszkowski and Dr. Lewis on the grounds that these doctors operated offices in the same geographic area as Dr. Regan's office and would, therefore, "benefit economically by an adverse decision to Dr. Regan." Dr. Regan moved for the recusal of the entire Board because "the impartiality of the entire Board will be contaminated if it recuses" the aforementioned members. Dr. Regan argued that the Board "should delegate its authority to conduct the evidentiary hearing" to the Maryland Office of Administrative Hearings, an independent agency.

The Board denied Dr. Regan's motion and declined to delegate its authority to the Office of Administrative Hearings. In response to Dr. Regan's arguments concerning Dr. Lewis, the Board held that "Dr. Lewis, like all other Board members, has pledged to carry out his responsibilities as a public official; part of those responsibilities, as a Board member, is to participate in hearings; in so doing, all of the members have pledged to listen to all of the evidence presented and render a fair and impartial decision." Additionally, the Board concluded that Dr. Regan's argument as to Dr. Lewis's and Dr. Goszkowski's financial interests was "speculative and baseless." The Board stated that Dr. Klinger would not testify at the hearing and that, if Dr. Klinger did in fact telephone Dr. Regan concerning the advertisement, "that [stipulation] can be arrived at or same can be contained in the Findings of Fact that will form part of the Board's Order following the hearing." The Board held that Dr. Blanck also would not testify at the hearing and did not need to recuse herself. Finally, in declining to refer the case to the Office of Administrative Hearings, the Board reasoned that the final decision will ultimately be the Board's regardless of which agency conducts the hearing, and that the Board is in a better position, because of its expertise, to determine what constitutes the practice of chiropractic.

On November 2, 1994, Dr. Regan filed in the Circuit Court for Harford County a petition for interlocutory review of the Board's decision and a motion to stay the proceedings. On November 10, 1994, the circuit court denied the requested relief. Also, on November 10, 1994, the Board voted to dismiss all of the advertising charges, in part, because Dr. Regan "withdrew the advertisement immediately" after "receiving a telephone call from the Board's President, Dr. Audie Klinger, that said advertisement violated the Act [§§ 3-313(19) and 3-407] and COMAR 10.43.03."

The Board conducted an evidentiary hearing which commenced on November 14, 1994, and continued over the course of seven days. The matter was heard by a quorum of the Board consisting of the following members: Dr. Klinger, Dr. Lewis, Dr. Blanck, consumer member Ivy Logan Harris, and Dr. Goszkowski. The Board, in a 92-page opinion containing detailed findings of fact and conclusions of law, determined that Dr. Regan violated the following provisions of the Health Occupations Article: § 3-313(8) (unethical conduct in the practice of chiropractic); § 3-313(12) (filing a false report or record in the practice of chiropractic); § 3-313(18) (practicing chiropractic with an unauthorized person or supervising or aiding an unauthorized person in the practice of chiropractic); and § 3-313(21) (unprofessional conduct in the practice of chiropractic). The Board ordered that Dr. Regan's license be suspended for two years and that he be placed on probation for three years subject to specified conditions.

The Board's factual findings, based on the testimony of witnesses, were as follows. The Board found that Dr. Regan "practiced with, supervised and aided several unlicenced individuals in the practice of chiropractic." In addition, the Board found that the testimony established that Dr. Regan delegated the following duties to unlicenced individuals: consultation with patients, taking patient history, conducting examinations, conducting tests, taking x-rays, performing physical therapy modalities, and writing reports for third party payors. The Board stated that the tests performed by the unlicenced persons were used by Dr. Regan "to form a diagnosis which

was used to make a treatment plan for his patients. Tests performed by unlicenced individuals posed a risk to patients that diagnoses and treatment plans would be inaccurate or erroneous, because same required professional skills, extensive training and clinical judgment." The Board found that Dr. Regan "failed to document a systematic training program for the unlicenced individuals that he supervised." The Board held that "it is not consistent with sound chiropractic practice for a licensee to permit unlicenced staff to perform the entire consultation, determine areas that need to be x-rayed and position patients for same, conduct a full examination involving range of motion, orthopedic, sensory evaluations and neurological assessments, and to determine what types of physical therapy are needed based on those examinations."

The Board also found that Dr. Regan "submitted false statements in the practice of chiropractic" when he billed a patient's insurer for physical therapy which the patient's chart did not indicate that she received on the dates billed. Furthermore, the Board said that Dr. Regan "disguised non-covered services, such as manipulation, as a covered service in order to bill" the insurer. The Board found that Dr. Regan established the billing policy for the office, was responsible for it, and instructed the employees to falsify records.

The Board's charges with respect to Dr. Regan's alleged attempt to have his employees seduce Board members were dismissed at the conclusion of the State's case pursuant to Dr. Regan's motion. The Board did not hear any evidence or make any findings regarding the alleged seduction scheme.

Subsequently the parties agreed, by filing a consent order, to stay the suspension of Dr. Regan's license pending judicial review. Dr. Regan has continued to practice chiropractic while he awaits the review of the Board's action, and, according to the Board, he has complied with the Board's conditions of probation.

Dr. Regan filed in the Circuit Court for Baltimore City an action for judicial review of the Board's order. In February 1997 the circuit court affirmed the Board's decision, holding

that the decision "does not constitute a denial of [Dr. Regan's] rights to due process, does not constitute reversible error of law, is not arbitrary and capricious, and is supported by competent, material and substantial evidence in light of the entire record as submitted."

On Dr. Regan's appeal to the Court of Special Appeals, the appellate court upheld the Board's decision "insofar as it relates to violations of the Maryland Chiropractic Act" but ordered that the administrative decision be vacated with respect to sanctions because "Dr. Regan has already served what is in effect a probationary period almost equal to that ordered by the Board." *Regan v. Board of Chiropractic,* 120 Md.App. 494, 523–524, 707 A.2d 891, 905 (1998). The appellate court ordered that the case be remanded to the Board for it to "consider whether the sanctions previously imposed remain appropriate or should be modified." 120 Md.App. at 524, 707 A.2d at 905.

Before the Court of Special Appeals, Dr. Regan challenged the participation in the Board's proceedings of only two Board members: Dr. Klinger because of his personal involvement with the advertising charges, and Dr. Lewis because of the alleged seduction scheme. The Court of Special Appeals upheld the denial of the recusal motion as to both Dr. Klinger and Dr. Lewis, stating that recusal would have made a quorum of the Board impossible, thereby depriving the Board "of its right to hear the matter involving Dr. Regan." 120 Md. App. at 513, 707 A.2d at 900. Additionally, the appellate court held that Dr. Regan failed to demonstrate any prejudice or actual bias on the part of the Board members. Instead, the court stated that Dr. Regan was merely arguing "generalities and appearances." *Ibid.*

The Court of Special Appeals rejected Dr. Regan's arguments that he was not given adequate notice of new facts developed at the hearing and contained in the Board's findings but not set forth in the Board's charging document. The appellate court concluded that "(1) the Board gave Dr. Regan adequate and reasonable notice of the nature of the allega-

tions, and (2) that the notice provided to Dr. Regan enabled him to prepare an adequate defense." 120 Md.App. at 519–520, 707 A.2d at 903.

Dr. Regan filed in this Court a petition for a writ of certiorari which we granted.[2] *Regan v. State Board*, 350 Md. 488, 713 A.2d 981 (1998). In his certiorari petition, Dr. Regan presented the following questions for our review:

"1. Whether the Court of Special Appeals erroneously held that Dr. Regan was required to demonstrate actual bias to succeed on a recusal motion based upon appearance of impropriety where the hearing panel included one member who was named in the charging document as the target of a blackmail-type scheme allegedly orchestrated by Dr. Regan and had personal knowledge of disputed evidentiary facts concerning that charge and another who had personal knowledge of facts relating to an advertising charge?

"2. Whether the Court of Special Appeals committed reversible error when it improperly upheld the Board's denial of Dr. Regan's recusal motion by reasoning that the right of the Board to assert jurisdiction was paramount to the right of the accused to an impartial tribunal?

"3. Whether the Court of Special Appeals erroneously decided that the Board provided Dr. Regan with legally adequate prior notice of the charges against him even though it prosecuted him based on allegations not set forth in the charging document?"

## II.

We shall treat the first and second questions together, as they are both concerned with whether the Board was not

2. The Board did not file in this Court a cross-petition for a writ of certiorari challenging the portion of the Court of Special Appeals' judgment ordering that the case be remanded to the Board to reconsider the sanctions imposed. Consequently, the propriety of that portion of the Court of Special Appeals' judgment is not before us, and we express no view with respect to the matter.

impartial because of the failure of Drs. Klinger and Lewis to have recused themselves.

Dr. Regan argues that the Court of Special Appeals "improperly imposed upon Dr. Regan the burden of demonstrating actual bias." (Petitioner's brief at 15). Dr. Regan contends that actual bias is not necessary to recuse an administrative fact finder; instead, a "fact finder may just as well be recused based on his appearance of impropriety in a particular case." (*Ibid.*, emphasis omitted). Dr. Regan asserts that Drs. Klinger and Lewis should have recused themselves because their participation gave the appearance of impropriety. He contends that the dismissal of the advertising charge and the charge concerning the seduction plot did not cure this appearance of impropriety. Dr. Regan maintains that Dr. Lewis's participation is particularly improper because "there can be no reasonable dispute that someone who is allegedly the target of a blackmail plot may not sit in judgment of the individual accused of masterminding that plot without giving rise to an appearance of impropriety." (*Id.* at 19).

We have often stated that "[p]rocedural due process, guaranteed to persons in this State by Article 24 of the Maryland Declaration of Rights, requires that administrative agencies performing adjudicatory or quasi-judicial functions observe the basic principles of fairness as to parties appearing before them." *Maryland State Police v. Zeigler*, 330 Md. 540, 559, 625 A.2d 914, 923 (1993). *See, e.g., Schultz v. Pritts*, 291 Md. 1, 7, 432 A.2d 1319, 1323 (1981); *Ottenheimer Pub. v. Employ. Sec. Adm.*, 275 Md. 514, 520, 340 A.2d 701, 704 (1975); *Rogers v. Radio Shack*, 271 Md. 126, 129, 314 A.2d 113, 115 (1974); *Dal Maso v. Bd. of Co. Comm'rs*, 238 Md. 333, 337, 209 A.2d 62, 64–65 (1965).

■ The doctrine that every person is entitled to a fair and impartial hearing "applies to an administrative agency exercising judicial or quasi-judicial functions," and "is specifically applicable" to issues of disqualification, although "disqualification will not be permitted to destroy the only tribunal with

power in the premises." *Board of Medical Examiners v. Steward,* 203 Md. 574, 582, 102 A.2d 248, 251–252 (1954). *See Department of Human Resources v. Bo Peep,* 317 Md. 573, 607–608, 565 A.2d 1015, 1032 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990) ("actual bias" standard determines whether a hearing officer should recuse himself). *See also, e.g., Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1, 8 (1982) ("due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities"); *Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488, 500 (1973) (most of the law concerning disqualification based on interest applies equally to administrative adjudicators); *Morrissey v. Brewer,* 408 U.S. 471, 485, 92 S.Ct. 2593, 2602, 33 L.Ed.2d 484, 497 (1972) (preliminary determination that reasonable grounds exist for revocation of parole should be made by someone not directly involved in the case); *Peters v. Kiff,* 407 U.S. 493, 501, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83, 93 (1972) ("Due process requires a competent and impartial tribunal in administrative hearings"); *Hummel v. Heckler,* 736 F.2d 91, 93 (3rd Cir. 1984).

Dr. Regan conceded at oral argument before this Court that there was no showing of actual bias in the present case. As previously mentioned, however, he argues that Dr. Klinger and Dr. Lewis should have recused themselves because of "the appearance of impropriety" (petitioner's brief at 15).

Canon 3(C)(1) of the Maryland Code of Judicial Conduct, which is not applicable to members of the Maryland Board of Chiropractic Examiners, states that a "judge should not participate in a proceeding in which the judge's impartiality might reasonably be questioned." With regard to the Maryland regulations applicable to administrative law judges employed by the Office of Administrative Hearings, COMAR 28.02.01.08(A)(1) requires a judge to "[c]onduct a full, fair, and impartial hearing," and COMAR 28.02.01.08(C)(1)(a) states that an administrative law judge "shall withdraw from participation in any proceeding in which personal bias or other reasons render the judge unable to provide an impartial

hearing and decision, *or when an appearance of impropriety may reasonably be inferred from the facts.*" (Emphasis added). This Court has held, under the rules governing admission to the bar, that a member of a character committee should not participate in reviewing an application for admission to the bar where there is "the appearance of possible prejudicial influence." *In re Application of Charles M.*, 313 Md. 168, 178, 545 A.2d 7, 11 (1988). *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182, 189 (1980), quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11, 16 (1954) (the principle that " 'justice must satisfy the appearance of justice' " has been applied in a variety of settings including administrative agencies); *Gulf & Western Industries, Inc. v. United States*, 230 Ct.Cl. 1, 671 F.2d 1322, 1325 (1982), quoting *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301, 305 (1968) (" 'any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias' "); *Sussel v. Honolulu Civil Service Com'n*, 71 Haw. 101, 106–109, 784 P.2d 867, 870–871 (1989).

■ We shall assume, for purposes of this case, that the "appearance of impropriety" standard set forth in our cases involving judges and some others is applicable generally to the participation of members of Maryland administrative agencies performing quasi-judicial or adjudicatory functions, and that, therefore, the standard is applicable to members of the Maryland Board of Chiropractic Examiners.

■ In determining whether there is either actual bias or an appearance of impropriety on the part of a decision maker in a judicial or quasi-judicial proceeding, we begin with the presumption of impartiality. As Judge Bell observed for the Court in *Jefferson–El v. State*, 330 Md. 99, 107, 622 A.2d 737, 741 (1993),

"[T]here is a strong presumption in Maryland ... and elsewhere ... that judges are impartial participants in the legal process, whose duty to preside when qualified is as

strong as their duty to refrain from presiding when not qualified.... The recusal decision, therefore, is discretionary ... and the exercise of that discretion will not be overturned except for abuse."

The Court in *Jefferson-El,* 330 Md. at 107–108, 622 A.2d at 741, went on to discuss "the proper test to be applied" in determining whether there is an "appearance of impropriety," and quoted from *Boyd v. State,* 321 Md. 69, 86, 581 A.2d 1, 9 (1990), where the Court stated:

" '[T]he test to be applied is an objective one which assumes that a reasonable person *knows and understands all the relevant facts.* ... We disagree with our dissenting colleague's statement that recusal based on an appearance of impropriety ... "requires us to judge the situation from the viewpoint of the reasonable person, and not from a purely legalistic perspective." Like all legal issues, judges determine appearance of impropriety—not by what a straw poll of the only partly informed man-in-the-street would show— but by examining the record facts and the law, and deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge.' " (Quoting *In Re Drexel Burnham Lambert, Inc.,* 861 F.2d 1307, 1313 (2d Cir.1988), *cert. denied,* 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989)).

*See also, e.g., Surratt v. Prince George's County,* 320 Md. 439, 468, 578 A.2d 745, 759 (1990) ("Using an objective standard precludes the necessity of delving into the subjective mindset of the challenged judge"); *In re Turney,* 311 Md. 246, 253, 533 A.2d 916, 920 (1987) ("The test generally used in the application of [the] standard is an objective one—whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned").

■ Applying this standard to the present case, we conclude that Dr. Klinger and Dr. Lewis were not required to recuse themselves.

Dr. Regan argued that Dr. Klinger should have recused himself because Dr. Klinger called Dr. Regan with respect to a newspaper advertisement and informed Dr. Regan that he should include his own name in the advertisement. Dr. Regan was under the impression that, once he cured this defect in the advertisement, he would not be subject to disciplinary action because of the advertisement. Despite this assumption, the charging document contained allegations of violations of advertising laws and regulations. Nevertheless, the advertising charges were dismissed prior to the hearing.

 Merely calling Dr. Regan about the advertisement does not rise to the level of an appearance of impropriety, especially with respect to an administrative body such as the Board of Chiropractic Examiners. Administrative agencies often combine investigative and adjudicative functions. Simply because an administrator may have some earlier knowledge of a case does not mean that he or she is precluded from rendering a fair decision after all of the evidence has been presented in an evidentiary hearing. *See, e.g., American Recovery Co. v. Dep't of Health,* 306 Md. 12, 25, 506 A.2d 1171, 1177 (1986) ("the mere recitation by an agency official of the underlying facts that are alleged to support the charges in question does not inherently manifest bias on the part of the agency official, so as to preclude such official from rendering a fair decision after all the evidence has been brought out through the adversarial process"); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 764, 501 A.2d 48, 65 (1985) ("the issuance of press releases announcing charges by the agency that will ultimately decide the case does not violate due process guarantees"); *Board of Medical Examiners v. Steward, supra,* 203 Md. at 583, 102 A.2d at 252 ("an administrative agency is sometimes required to act as both prosecutor and judge, and it has never been held that such procedure denies constitutional right"); Richard E. Flamm, *Judicial Disqualification,* § 30.5.4 (1996) ("Administrative decisionmakers do not automatically become biased merely because they have become familiar with the facts of a proceeding through the performance of their administrative duties").

Moreover, we have held that a judge is not necessarily disqualified for having earlier expressed an opinion as to a case. *See Doering v. Fader,* 316 Md. 351, 558 A.2d 733 (1989) (trial judge who had previously expressed an opinion as to the impropriety of death sentence in the particular case was not disqualified from presiding at the later capital sentencing hearing). In the present case, the advertising charge was dismissed, thereby diminishing any concern as to whether any previously formed opinion by Dr. Klinger might create an appearance of prejudice.

It is difficult to imagine that a reasonable person, knowing all of the facts, would believe that Dr. Klinger was biased, particularly since the charge was promptly dismissed before the hearing ever began and since no evidence was heard on the matter. Furthermore, the advertising charge was neither complex nor emotionally charged; it merely concerned a matter-of-fact question as to whether or not Dr. Regan included his name in an advertisement. Dr. Regan has failed to demonstrate any appearance of impropriety by Dr. Klinger's taking part in the hearing and decision.

Similarly, we do not believe that a reasonable person, knowing and understanding all of the relevant facts, would believe that Dr. Lewis was prejudiced because of the alleged seduction plot. Dr. Lewis was not even aware of the alleged plot until it came to his attention during the course of the investigation. Assuming the truth of the allegations, Ms. Gee did not make any attempt to sexually entice Dr. Lewis and did not inform him of the purpose of her visit to his office. No evidence was taken concerning the alleged plot either before, during, or after the hearing. The charge based on the alleged misconduct was dismissed. The allegation remains merely an allegation of an attempt to orchestrate a seduction scheme. All of these factors diminish any likelihood that Dr. Lewis could not hear and decide the case impartially. A reasonable person, knowing and understanding all of the facts, would not conclude that Dr. Lewis was likely to have been prejudiced.

In addition, the alleged seduction plot did not involve any conduct on the part of Dr. Lewis; rather, the allegations concerned the purported actions of Dr. Regan. Although an appearance of impropriety can result from many different factual scenarios, courts have been most reluctant to find an appearance of impropriety on the basis of a litigant's actions. For example, in *Attorney Griev. Comm. v. Hollis,* 347 Md. 547, 559, 702 A.2d 223, 229 (1997), this Court was unwilling to disqualify a judge merely because a party had refused to support the re-election of the judge. In *Attorney Griev. Comm. v. Kerpelman,* 292 Md. 228, 241, 438 A.2d 501, 508 (1981), this Court was unwilling to disqualify a judge on the ground that the litigant had earlier written an article criticizing the judge. *See also, e.g., United States v. Hillsberg,* 812 F.2d 328, 335 (7th Cir.1987), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (the court held that recusal was not required where the defendant's mother had written to the judge before the defendant's trial, reasoning that "any defendant who wished a change of judge would require no more than a note from his mother"); *United States v. Studley,* 783 F.2d 934, 940 (9th Cir.1986) (a "judge is not disqualified by a litigant's suit or threatened suit against him" nor "by a litigant's intemperate and scurrilous attacks"); *United States v. Bray,* 546 F.2d 851, 858 (10th Cir.1976) ("Prior written attacks upon a judge" are insufficient to support a charge of bias or prejudice); *Pote v. State,* 733 P.2d 1018, 1020–1021 (Wyo.1987); *In re Martin–Trigona,* 573 F.Supp. 1237 (D.Conn.1983), *appeal dismissed,* 770 F.2d 157 (2nd Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

█ Thus, courts have been reluctant to allow litigants to utilize motions for recusal, based on the litigants' conduct, in order to "judge shop." In *United States v. Owens,* 902 F.2d 1154, 1156 (4th Cir.1990), the United States Court of Appeals for the Fourth Circuit held:

"Parties cannot be allowed to create the basis for recusal by their own deliberate actions. To hold otherwise would encourage inappropriate 'judge shopping.' It would invite

litigants to test the waters with a particular judge and then to take steps to create recusal grounds if the waters prove uncomfortably hot."

*See also United States v. Dalfonso,* 707 F.2d 757, 761 (3rd Cir.1983); *United States v. Bray, supra,* 546 F.2d at 858; *In re Martin–Trigona, supra,* 573 F.Supp. at 1243 ("The right to an impartial judge cannot be advanced so broadly as to permit the parties to engage in 'judge-shopping' under the guise of a motion to recuse"). Motions for recusal are "not meant to be abused as elements of trial strategy." Richard E. Flamm, *Judicial Disqualification, supra,* § 21.1.

█ A litigant ordinarily should not be permitted to create an appearance of impropriety in order to disqualify a judge. *In re WHET, Inc.,* 33 B.R. 424 (D.Mass.1983). Courts have long "recognized that this type of conduct should not be rewarded—that is, that a party should not be permitted to cause the disqualification of a judge by its own intentional actions." Flamm, *Judicial Disqualification, supra,* § 21.4.1. *See Wilks v. Israel,* 627 F.2d 32, 37 (7th Cir.1980), *cert. denied,* 449 U.S. 1086, 101 S.Ct. 874, 66 L.Ed.2d 811 (1981); *State v. Jeffers,* 135 Ariz. 404, 428, 661 P.2d 1105, 1129 (1983), *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (holding that recusal was not required where a litigant made the trial judge the target of a scheme involving the receipt of unsolicited goods from several mail order firms, reasoning that this "kind of conduct should not be rewarded"); *Matter of Extradition of Singh,* 123 F.R.D. 140, 149 (D.N.J.1988) (no recusal based on the receipt of a threat because recusal "would only encourage litigants to send threats in the hope of forcing recusal and obtaining a different judge").

In the present case, we are unwilling to require recusal based on Dr. Regan's own alleged actions. Prior to the hearing, Dr. Regan moved to recuse *all* of the Board members. A reasonable person might well conclude, based on all of the facts, that Dr. Regan was attempting to obtain what he may have viewed as a more favorable forum for his disciplinary hearing. In any event, we do not believe that a reason-

able person, knowing the facts, would conclude that Dr. Lewis was prejudiced against Dr. Regan because of the alleged seduction plot.

### III.

Dr. Regan argues that, in several respects, the Board failed to provide him "with adequate notice of the charges against him," (petitioner's brief at 26). Consequently, according to Dr. Regan, the Board violated the Maryland Administrative Procedure Act, Code (1984, 1995 Repl.Vol.), § 10–207(a) and (b) of the State Government Article. Section 10–207 states in pertinent part as follows:

" § 10–207. Notice of agency action.

(a) *In general.*—An agency shall give reasonable notice of the agency's action.

(b) *Contents of notice.*—The notice shall:

(1) state concisely and simply:

(i) the facts that are asserted; or

(ii) if the facts cannot be stated in detail when the notice is given, the issues that are involved;

(2) state the pertinent statutory and regulatory sections under which the agency is taking its action;

(3) state the sanction proposed or the potential penalty, if any, as a result of the agency's action;

(4) unless a hearing is automatically scheduled, state that the recipient of notice of an agency's action may have an opportunity to request a hearing, including:

(i) what, if anything, a person must do to receive a hearing; and

(ii) all relevant time requirements; and

(5) state the direct consequences, sanction, potential penalty, if any, or remedy of the recipient's failure to exercise in a timely manner the opportunity for a hearing or to appear for a scheduled hearing."

\* \* \*

*See Reed v. Baltimore,* 323 Md. 175, 184, 592 A.2d 173, 177 (1991) ("The obvious purpose of the notice requirement . . . is to apprise the [party] of the charges warranting disciplinary action in sufficient detail to enable the [party] to marshal evidence and arguments in defense of the assertions").

We agree with the Board and with both courts below that Dr. Regan received "reasonable notice" of the charges and that, therefore, there was no violation of § 10–207 of the Administrative Procedure Act.

Dr. Regan first challenges the adequacy of notice in the charging document regarding witness Deborah Tibbs Tillman. In the charging document, the Board alleged that Ms. Tillman, unlicenced and not a graduate of a chiropractic school, performed "patient examinations, consultations, and reports for workers compensation and personal injury patients." Also, the charging document alleged that Ms. Tillman falsified reports in order to prolong treatment. After conducting the hearing, the Board found that Ms. Tillman was an unlicenced high school graduate who applied physical therapy modalities, such as heat, ice, ultrasound and electrical stimulation. In addition, the Board found that Ms. Tillman conducted consultations, took patient histories, performed examinations, decided which areas needed to be x-rayed, decided what physical therapy should be performed on patients, and filled out reports to third party payors.

Dr. Regan argues that the Board did not adequately notify him that it would seek to hold him liable for Ms. Tillman's unauthorized practice of "physical therapy" as opposed to the unauthorized practice of "chiropractic." The short answer to this argument, as pointed out by the Board, is that the performance of physical therapy was within the scope of Dr. Regan's chiropractic license, that both services were provided at his clinics, and that Dr. Regan was not independently licensed as a physical therapist. *See* § 3–301(c) of the Health Occupations Article. The gist of the charges concerning Ms. Tillman, and the gist of the Board's findings, was that Dr.

Regan improperly delegated duties to her which Dr. Regan was authorized to perform under his chiropractic license and which Ms. Tillman was not authorized to perform. Dr. Regan had ample notice of the charges relating to Ms. Tillman.

Dr. Regan next argues that the charges relating to the witness Karen Trotta did not afford adequate notice. Ms. Trotta was both an employee and a patient of Dr. Regan. In the charging document, the Board alleged that Ms. Trotta, an unlicenced chiropractic assistant, conducted patient consultations, performed patient examinations, and wrote reports. The Board's findings as to Ms. Trotta concluded that she was an unlicenced high school graduate who performed consultations, performed examinations, and completed insurance reports. The Board also found that Dr. Regan "failed to document that Trotta received a systematic training program for the activities which she performed." Dr. Regan contends that the Board exceeded the scope of the charges by questioning Ms. Trotta about whether Dr. Regan billed her for chiropractic services not rendered. He also asserts that the Board erred in finding that he failed to document whether Ms. Trotta had completed a required training program because such failure was not alleged in the charging document.

With respect to billing Ms. Trotta for chiropractic services not rendered, the Board, in its findings concerning false reports and bills based on false reports, made no findings about false bills concerning Ms. Trotta. The Board also did not discipline Dr. Regan for this action. Similarly, the Board did not discipline Dr. Regan because of his failure to document whether Ms. Trotta had completed a required training program. In the detailed portion of its opinion entitled "Conclusions of Law," which sets forth the basis for the disciplinary action imposed, there is no mention of either of these matters relating to Ms. Trotta. Consequently, Dr. Regan was not disciplined for matters relating to Ms. Trotta which were not covered by the charging document.

Finally, Dr. Regan maintains that he was not given "notice of its [the Board's] intention to prosecute him for Laura

Orem's role as a chiropractic assistant engaged in the unauthorized practice of chiropractic. The factual allegations in the Charging Document concerning Ms. Orem are limited exclusively to the Board's allegation that Dr. Regan 'billed Ms. Orem's insurance for physical therapy she never received.' " (Petitioner's brief at 28–29).

Laura Orem was both an employee and a patient of Dr. Regan. In the charging document, the Board alleged as follows:

"In August 1991, the Respondent hired Laura Orem to work in the Bel Air Clinic as a front desk receptionist, chiropractic assistant, and examination assistant at the Bel Air Clinic. In January 1992, Ms. Orem became a patient of the Respondent. During the course of her treatment, the Respondent billed Ms. Orem's insurance for physical therapy she never received."

The Board made the following statement in its opinion:

"Laura Orem worked at the Bel Air Clinic from August 1991 to July 1992 where she worked as a front desk receptionist and then trained as a chiropractic assistant, providing physical therapy which consisted of electrical stimulation, hot packs and ultrasound. Orem also did patient consults, taking patient histories."

In a footnote, the Board continued:

"Although there are allegations in the charges regarding the fact that Orem performed as a chiropractic assistant, the specifics of those duties were not set forth in the type of detail that described the unlicenced activities of the others. Orem testified that she worked as a chiropractic assistant, which testimony is supported by that of Eid and the Respondent. Therefore, although the Board notes that Orem may have performed some duties for which either training, skills or competency were required, the focus of the Board's findings and subsequent discussion will be on the Respondent's charging Orem for services not rendered."

The Board concluded that Dr. Regan "submitted false statements in the practice of chiropractic in that he billed Laura

Orem's insurer for physical therapy which her chart did not indicate that she received on the dates billed" and "that he provided physical therapy on her chart when she received manipulation." It is clear from the Board's findings and conclusions that Dr. Regan was not disciplined because he had Ms. Orem engage in the unauthorized practice of chiropractic. Instead, discipline insofar as it was based on matters concerning Ms. Orem, was based entirely on the fraudulent billing practices. Again, Dr. Regan was not disciplined for a matter not covered by the charging document.

The Board's findings and conclusions encompassed two primary areas of misconduct: improper delegation of chiropractic duties and fraudulent billing practices. Dr. Regan was given reasonable notice in the charging document of these matters. Furthermore, the Board's conclusions, forming the basis for the imposition of discipline, concerned matters specifically encompassed by the charging document. The Board and both courts below correctly held that Dr. Regan had reasonable notice of the charges against him.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.*